OPINION OF THE COURT
Leah Marks, J.
These are termination of parental rights cases at the dispositional stage when the court must decide what the future should hold for these two children. There is no dispute about terminating all parents’ rights. No one argued against the grandmother’s adoption of J. who has been living with her grandmother from the beginning of her life.
The real issue before the court is E.’s future. E. was born on January 25, 1990, and has lived with her white, lesbian foster parent since May 10, 1990. Both her foster parent and her African-American grandmother wish to adopt her.
THE FACTS
E.’s condition at birth led to her being in the hospital for three months before her release. She was four months old when she was placed with G. G., her foster parent. Her grandmother did not wish to care for her then.
E. was born with a cleft palate and a positive toxicology for cocaine. As a result, E. required three surgical operations and many dental procedures while she lived with her foster parent and that woman’s lover who is still a part of that family group. In addition, E. had fluid behind her eardrums and chronic ear infections which may have been corrected by surgery inserting tubes into her ears.
Because of her birth defects, E. is delayed in learning language and has difficulty articulating. More reconstructive surgery may be needed.
Mrs. M. had a visit with E. in April 1991, when E. was almost 15 months old. Prior to that, Mrs. M. had visited with E. only when she was two days old. Mrs. M. did not begin to visit E. with any regularity until E. was two years old. In May 1991, she asked for E. to live with her, but her actions did not support that request. Mrs. M. did not wish to visit often at that time, and E. did not know her. In fact, E. was two years old when Mrs. M. began visiting often enough to establish a relationship with E.
No one prevented Mrs. M. from entering E.’s life early and *99 becoming her nurturing lifeline. Perhaps Mrs. M.’s health and understandable emphasis on J. prevented it.
E. is black and her foster mother is white. Ms. G. has taken that difference into consideration from the beginning, ensuring E. has a racially mixed school, neighborhood, church and friends of all backgrounds.
E. needs a substantial amount of special care. She must be taken to special schools, speech and language programs, and physicians who can deal with her problems. Possibly due to her vast medical problems, including exposure to drugs in the womb, she has even greater need than a normal child for someone she can trust.
THE LAW
Under the law this dispositional hearing is focused on the child’s best interests.[1] The law requires that emphasis alone. It is not a time to worry about what might have been, but to look at the present situation.
The statutory scheme would give preference to the parents, but none is applying to care for the children before me.
Other relatives have no greater right to a child’s custody than a nonrelative.[2] Contrary to forceful arguments against having this child with a white lesbian, the law of this State and Nation does not legitimatize private prejudices.[3] Such prejudices shall not prevent careful consideration of the child’s interests and needs.
Whether deciding the child’s best interests in a custody dispute between parents or between others, the court must consider the totality of the circumstances.[4]
We must look at the care and affection shown to and returned by the child, the ability and availability of the prospective parent, the suitability of the home, and the result on the child of any change in that home.[5]
The child’s stability, physical and emotional security are more important than the desires of either adult requesting the right to adopt E.
"Stability of the child’s environment and a reluctance to *100 uproot him from familiar surroundings, quite properly is a relevant and important consideration.”[6]
THE DECISION
Every child needs "stable and continuous relationships.”[7] Children also need continuity of care and are at risk for great suffering if such care is interrupted.[8]
Dr. Schuyler Whitman, an expert in child psychiatry, although supporting E.’s transfer, said "there might be some regression in the transition.” When asked whether E.’s medical condition would affect her removal, she said, "I don’t think it presents insurmountable obstacles; she certainly needs ongoing care.” However, later in her testimony she describes "a profound loss” that would result from a change in her home.
Mrs. M.’s failure to use E.’s early months and years led to clear and convincing testimony that E.’s bond with Ms. G. was established by the time this trial began on October 15, 1992.
E. is not a verbal child today. Expert testimony indicates that it would be destructive for her to be separated from the person who has lived with her all this time, stayed with her in hospitals when she was recuperating from surgery, held her hand during and after dental procedures, and been a loving parent everyday of her life from the time she was a few months old.
The court heard evidence of all kinds. J. M. and G. G. testified at length along with two caseworkers, a family counselor, and two psychologists. Much documentary evidence was entered.
No one testified that E.’s chance for optimal growth and development would be improved by changing her home. Some thought she could stand being moved, that she would not be unduly harmed.
Certainly, it is preferable that a child live with the child’s own family from the beginning. This is no longer the beginning.
When this trial began, E. was already psychologically *101 bonded to her foster parent, and any change in her caretaker now would be at the risk of the child’s health and happiness. E. is developing despite language deficits, learning disabilities, and physical defects; "the most important thing now is, is she getting what she needs in her current home.”[9] If it is a loving, caring, and safe home, E. should remain there.
The argument has been made that E. will not suffer unduly if placed with her grandmother for adoption. However, it is clear that suffering will result, and no one can be sure of its extent or its results on E.’s life now and forever into the future.
Recent history is filled with people who permit and encourage suffering to pursue an ethnic cleansing when bloodlines have become more important than our humanity. E. shall not be abused in that manner.
The parental rights of C. N., T. W. and A. H. are terminated. J. shall be adopted by her grandmother who has provided her with a loving home, safety and security for years. E. shall be adopted by her foster mother who has provided her with a loving home, safety and security for years.
Both Mrs. M. and Ms. G. love and care for E. It is time they put aside their concerns for themselves and any prejudices they may have against one another to establish visitation between E. and her sister, and include other relatives in their lives. In that way we will help both E. and J. to have a full, loving relationship and respect for one another’s homes and families.

. Family Ct Act §§ 623, 625, 631.

. Matter of Peter L., 59 NY2d 513 (1983).

. Palmare v Sidoti, 466 US 429 (1984).

. Eschbach v Eschbach, 56 NY2d 167 (1982).

. Friederwitzer v Friederwitzer, 55 NY2d 89 (1982).

. 2 Foster and Freed, Law and the Family New York § 29.5, at 510. Based upon a series of cases.

. Dr. Schuyler Whitman, testifying March 2, 1993 at page 37, line 24 to page 38, line 3.

. Dr. Whitman; the court’s interpretation of March 2, 1993 transcript, at 38.

. Dr. Mildred Tashman, testifying October 26, 1992, at 51, lines 24-25.