## Pamela Kay Bottoms

### v.

## Sharon Lynne Bottoms

Record No. 941166

April 21, 1995

Present: All the Justices

*Richard R. Ryder*, for appellant.

*Donald K. Butler (Player B. Michelsen; Stephen B. Pershing; William B. Rubenstein; Ruth E. Harlow; Marc E. Elovitz; Morano, Colan & Butler; American Civil Liberties Union Foun-*

dation of Virginia; American Civil Liberties Union Foundation, on brief), for appellee.

Amicus Curiae: (Lawrence D. Diehl; Cynthia L. Greene; Elser, Greene, Hodor & Fabar, on brief), in support of appellee.

Amicus Curiae: (Kathleen A. Dooley; Renae R. Patrick, Laurie E. Forbes; L. Anne Coughenor, on brief), in support of appellee.

Amicus Curiae: (James L. McHugh, Jr.; Dort S. Bigg; Carolyn I. Polowy; Carolyn F. Corwin; Julie Abbate; Stephen W. Bricker, on brief), in support of appellee.

Amicus Curiae: (Pia J. North; Elizabeth Hendrickson; Kathryn Kendell; Shannon Minter; Beatrice Dohrn; Laura Foggan; Elizabeth Eastwood, on brief), in support of appellee.

JUSTICE COMPTON delivered the opinion of the Court.

This is a child custody dispute between a child's mother and maternal grandmother. The sole issue is whether the Court of Appeals erred in deciding that the child's best interests would be served by awarding custody to the mother. We conclude that the Court of Appeals erred, and reverse.

No novel questions of law are involved; the legal principles applicable under these circumstances to child custody cases are settled in the Commonwealth. We took jurisdiction of this appeal because we decided that the application of the law to the facts of this case involves a matter of significant precedential value. See Code § 17-116.07(B).

In March 1993, appellant Pamela Kay Bottoms filed a petition against her daughter, appellee Sharon Lynne Bottoms, in the Juvenile and Domestic Relations District Court of Henrico County seeking an award of custody of the daughter's son, born in July 1991. In the petition, the grandmother alleged that the "infant is currently living in an environment which is harmful to his mental and physical well being." Following a hearing, at which both parties were represented by counsel, the juvenile court awarded custody to the grandmother and granted the mother restricted visitation rights. The mother appealed to the circuit court.

In May 1993, because the mother stated she was not represented by an attorney at that time, the circuit court appointed a guardian ad litem "for the infant child to represent him in these proceedings." Following psychological evaluations of the parties and the child, and after studies of the homes of the parties, the

trial court conducted a hearing *de novo* in September 1993 at which eight witnesses testified. Participating in the hearing were the grandmother's attorney, the guardian ad litem, and the mother's present counsel. At the conclusion of the hearing, the trial court ruled that custody of the child should be awarded to the grandmother, with restricted visitation rights granted the mother.

The mother appealed to the Court of Appeals. A three-judge panel unanimously reversed and vacated the trial court's order, remanding the case to the circuit court for entry of an order "effectuating the resumption of custody by the mother of her son." *Bottoms* v. *Bottoms*, 18 Va. App. 481, 495, 444 S.E.2d 276, 284 (1994). We awarded the grandmother this appeal from the Court of Appeals' June 1994 order.

■ "In all child custody cases, including those between a parent and a non-parent, 'the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute.'" *Bailes* v. *Sours*, 231 Va. 96, 99, 340 S.E.2d 824, 826 (1986) (quoting *Walker* v. *Brooks*, 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962)). In a custody dispute between a parent and non-parent, "the law presumes that the child's best interests will be served when in the custody of its parent." *Judd* v. *Van Horn*, 195 Va. 988, 996, 81 S.E.2d 432, 436 (1954).

■ Although the presumption favoring a parent over a non-parent is strong, it is rebutted when certain factors, such as parental unfitness, are established by clear and convincing evidence. *Bailes*, 231 Va. at 100, 340 S.E.2d at 827. The term "clear and convincing evidence" is defined as the measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction upon the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the degree of proof beyond a reasonable doubt as in criminal cases; it does not mean clear and *unequivocal. Fred C. Walker Agency, Inc.* v. *Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975). The burden to show unfitness is upon the one seeking to alter the parent's right to custody. *Walker* v. *Brooks*, 203 Va. at 421, 124 S.E.2d at 198.

■ In custody cases, the welfare of the child takes precedence over the rights of the parent. *Malpass* v. *Morgan*, 213 Va. 393, 399, 192 S.E.2d 794, 799 (1972). But, when the contest is between parent and non-parent, this rule is conditioned upon the

principle that a parent's rights "are to be respected if at all consonant with the best interests of the child." *Id.* at 400, 192 S.E.2d at 799. Some of the foregoing principles have been codified recently by the General Assembly in Code §§ 20-124.1 to -124.6. Acts 1994, ch. 769.

When the trial court hears the evidence *ore tenus*, its findings are entitled to the weight accorded a jury verdict, and these findings should not be disturbed by an appellate court unless they are plainly wrong or without evidence to support them. *Bailes*, 231 Va. at 100, 340 S.E.2d at 827. A reviewing court should never redetermine the facts on appeal.

■ Absent clear evidence to the contrary in the record, the judgment of a trial court comes to an appellate court with a presumption that the law was correctly applied to the facts. *Yarborough* v. *Commonwealth*, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977). And, the appellate court should view the facts in the light most favorable to the party prevailing before the trial court. Accordingly, we shall summarize the facts in the light most favorable to the grandmother, resolving all conflicts in the evidence in her favor.

This child's mother, born in February 1970, "dropped out" of school in the twelfth grade. Until she was 18 years of age, she resided at home with her mother, who is a divorcee, and her mother's boyfriend.

Upon leaving home, the child's mother was supported by and lived with a cousin, a friend, and a sister respectively. In December 1989, the child's mother married Dennis Doustou, whom she had been dating for several years. She left Doustou after eight months of marriage, and resumed living with the cousin for a while. The child was born during the separation in July 1991. The parties were divorced, and the mother was awarded custody of her child. The child's father has expressed little interest in his son and pays no child support.

The maternal grandmother, born in January 1951, resides in the Richmond area. Her boyfriend ceased living with her shortly before the juvenile court hearing, and has not returned. The grandmother did not complete her high school education, and has worked as a nurse's aide and manager of a shoe store. She currently is employed as a "nanny," taking care of two children.

During the two-year period before the trial court hearing, the child had spent 70 percent of the time with the grandmother and

30 percent with his mother. The grandmother has kept the child for "weeks at a time" and during "every weekend since he's been born." On at least three occasions during that period, the mother left the child with the grandmother without informing her of the mother's whereabouts or how she could be reached "in the event something happened to the child."

Following the mother's separation from Doustou, she continued a "relationship" with another man that had begun during her marriage. She contracted a venereal disease during this relationship that prevents her from having additional children. During the child's first year, the mother "slept with two or three different guys, maybe four, in the same room" with the child "where his crib was." At the time, the mother "lived two blocks away" from the grandmother, and the mother kept the child's "suitcase packed" for visits to the grandmother's home. The mother said that she has "had trouble" with her temper, and that when the child was about "a year" old, she "popped him on his leg too hard a couple of times," and left her fingerprints there. She has had "counseling" in an effort to control her temper.

At "some point subsequent to" the child's birth, the mother lived in a dwelling with yet another man who supported her for more than a year. After the mother "left" this man, she "lived with" a lesbian "couple."

Except for brief employment as a grocery store cashier, the mother had been unemployed during most of the three-year period prior to the trial court hearing. She was receiving "welfare money" which often was spent to "do her fingernails before the baby would get any food."

During May 1992, ten months before the juvenile court hearing, 16 months before the trial court hearing, and when her son was ten months old, the mother met April Wade, a lesbian. Wade, born in April 1966, had been discharged from the U.S. Army in 1986. Wade is a "recovering alcoholic."

The mother and Wade "moved in together" in September 1992. From that time, with the exception of a two-week period, the mother and Wade have lived in "a lesbian relationship." According to the mother, the relationship involves hugging and kissing, patting "on the bottom," sleeping in the same bed, "fondling," and "oral sex." The mother testified that she loves Wade and that they "have a lifetime commitment."

At the time of the juvenile court hearing, the mother, the child, and Wade were living in a two-bedroom apartment with "Evelyn," another lesbian. "At one time," the child's bed was in the room where the mother and Wade slept, having "sex in the same bed." At one point in her testimony, however, when asked "how many times did you do it when the child was sleeping in the same bedroom," the mother responded, "None." She said that she and Wade displayed other signs of affection "in front of" the child.

Wade, employed as a gift shop manager, supports the mother. The pair lives in an apartment complex in Western Henrico County. Wade has become "a parent figure" to the child, who calls Wade "Da Da."

Two months before the petition for custody was filed, the mother revealed her lesbian relationship to the grandmother. This disclosure alienated the two.

During the period after the juvenile court hearing, when regimented visitation with the mother began, the child demonstrated certain traits. For example, when the child returned to the grandmother from being with the mother, he would "stomp" his foot, tell himself to "go to the corner," and then would stand in the corner of a room, facing the wall. He curses, saying "shit" and "damn," language never used in the grandmother's home. On one occasion, when the mother and Wade "came to pick him up," the child "held his breath, turned purple. He didn't want to go with her," according to the grandmother. During a period in mid-1993, each time the mother "would come pick him up," the child would scream and cry.

Wade has admitted she "hit" the child. Also, on one occasion, when an argument developed between the mother and Wade, on the one hand, and the grandmother, on the other, about the timing of the exchange of the child for visitation, Wade said during the quarrel, "I might end up killing somebody." According to the grandmother, the child is "always neglected." For example, when the child returns to the grandmother's home, she testified that he "can't even sit down in the bathtub. That's neglect from changing his diaper. He is so red."

At the conclusion of the hearing, the guardian ad litem made a closing statement to the trial judge. Saying that he "took this appointment very seriously," the guardian ad litem stated he had "done extensive reading in many areas," including "the effect ho-

mosexuality will have on the rearing of children." He stated that he had "talked with psychiatrists in the field," and met "at length" with the mother, the grandmother, Wade, and the child, and "interviewed all of these parties as best I could." He asked another attorney, a woman, to assist him in order to obtain "another perspective." The guardian ad litem said that he and his associate "literally" spent the entire month before the hearing on the case.

In evaluating the case, the guardian ad litem said he is "a pretty open-minded guy" without any biases, "especially involving a homosexual issue." He stated that the child's father "should be ashamed of himself" for having no interest in the child and for contributing "nothing towards financial support of the child."

He stated that Wade is "a very nice person," but "she has a lot of baggage that she brings along with her" causing him to question her "stability." He observed that Wade genuinely "loves the child," but in view of her "rather sketchy" employment history, he was "curious as to how she will support the child if custody goes with" Wade and the mother.

Commenting on the mother, the guardian ad litem said he has "no question that she loves [the child] very much," but he found her to be a "very . . . immature young lady." He noted that she has "never really completed anything," has "jumped from relationship to relationship, from one place to another," and has "never really put roots down." Observing that "she has no employment to speak of, no skills, no education" and that her "future in the job market . . . is rather bleak," nevertheless, the guardian ad litem said, she is the child's natural mother, and "the love between a natural mother and child is something that's almost sacred." He stated that he "firmly" believed that the mother's love for the child "is an honest love" and "that she comes to this court with clean hands in that regard."

Referring to the grandmother, he said he found "her to be an equally very nice person, a very sincere person." He said he regarded her "as a bit more than" a third-party stranger, and that she has had "more than a typical grandmother relationship with the child." He noted she "has taken care of this child the majority of the child's life," and "has provided for the child financially, fed the child, clothed the child," and "taken the child to the doctor."

The guardian ad litem observed, "The homosexual issue does not alarm me," stating his belief "that a homosexual should be

allowed to raise a child." One matter "did concern" him about the mother. He referred to evidence that the mother separated herself from Wade after the juvenile court hearing, on the advice of counsel, to "help . . . with the custody fight," but returned to live with her two weeks later on the advice of new counsel. When asked why she is presently living with Wade if she thought living apart would help her regain custody, the mother responded, "I was taking a chance." The guardian ad litem observed that the mother felt her individual "rights" were as important as her child's.

■ Summarizing, and noting "that custody is something that's flexible and can change if the circumstances change," the guardian ad litem suggested to the court that the child's best interests, "at this time under this actual situation," would be served by awarding custody to the grandmother.

■ The trial judge, announcing his decision from the bench at the conclusion of the hearing, said the dispute "presents the question . . . whether the child's best interest is served by a transfer of the custody of the child from [his] mother to [his] maternal grandmother." Stating that the mother's conduct is "illegal," and constitutes a felony under the Commonwealth's criminal laws, and that "her conduct is immoral," the court recognized the "presumption in the law in favor of the custody being with the natural parent."

■ Mentioning the evidence of lesbianism and specified "other evidence" in the case not involving homosexual conduct, the trial court concluded from "all the facts and circumstances . . . of the case," that "the custody will be with the grandmother."

■ The Court of Appeals concluded that "the evidence fails to prove" that the mother "abused or neglected her son, that her lesbian relationship with April Wade has or will have a deleterious effect on her son, or that she is an unfit parent." *Bottoms*, 18 Va. App. at 484, 444 S.E.2d at 278. "To the contrary," said the Court of Appeals, the evidence showed that the mother "is and has been a fit and nurturing parent who has adequately provided and cared for her son. No evidence tended to prove that the child will be harmed by remaining with his mother." *Id.* The court held "that the trial court abused its discretion by invoking the state's authority to take the child from the custody of his natural mother . . . and by transferring custody to a non-parent, . . . the child's maternal grandmother." *Id.*

■ We disagree. The Court of Appeals failed to give proper deference upon appellate review to the trial court's factual findings, and misapplied the law to the facts viewed from a proper appellate perspective.

The evidence plainly is sufficient, when applying the clear and convincing standard and when viewing the facts from the correct appellate perspective, to support the trial court's findings that the parental presumption has been rebutted, that the mother is an unfit custodian at this time, and that the child's best interests would be promoted by awarding custody to the grandmother.

Among the factors to be weighed in determining unfitness are the parent's misconduct that affects the child, neglect of the child, and a demonstrated unwillingness and inability to promote the emotional and physical well-being of the child. Other important considerations include the nature of the home environment and moral climate in which the child is to be raised. *Brown v. Brown,* 218 Va. 196, 199, 237 S.E.2d 89, 91 (1977).

We have held, however, that a lesbian mother is not *per se* an unfit parent. *Doe v. Doe,* 222 Va. 736, 748, 284 S.E.2d 799, 806 (1981). Conduct inherent in lesbianism is punishable as a Class 6 felony in the Commonwealth, Code § 18.2-361; thus, that conduct is another important consideration in determining custody.

And, while the legal rights of a parent should be respected in a custody proceeding, those technical rights may be disregarded if demanded by the interests of the child. *Forbes v. Haney,* 204 Va. 712, 716, 133 S.E.2d 533, 536 (1963).

■ In the present case, the record shows a mother who, although devoted to her son, refuses to subordinate her own desires and priorities to the child's welfare. For example, the mother disappears for days without informing the child's custodian of her whereabouts. She moves her residence from place to place, relying on others for support, and uses welfare funds to "do" her fingernails before buying food for the child. She has participated in illicit relationships with numerous men, acquiring a disease from one, and "sleeping" with men in the same room where the child's crib was located. To aid in her mobility, the mother keeps the child's suitcase packed so he can be quickly deposited at the grandmother's.

The mother has difficulty controlling her temper and, out of frustration, has struck the child when it was merely one year old with such force as to leave her fingerprints on his person. While in

her care, she neglects to change and cleanse the child so that, when he returns from visitation with her, he is "red" and "can't even sit down in the bathtub."

Unlike *Doe*, 222 Va. at 747, 284 S.E.2d at 805, relied on by the mother, there is proof in this case that the child has been harmed, at this young age, by the conditions under which he lives when with the mother for any extended period. For example, he has already demonstrated some disturbing traits. He uses vile language. He screams, holds his breath until he turns purple, and becomes emotionally upset when he must go to visit the mother. He appears confused about efforts at discipline, standing himself in a corner facing the wall for no apparent reason.

And, we shall not overlook the mother's relationship with Wade, and the environment in which the child would be raised if custody is awarded the mother. We have previously said that living daily under conditions stemming from active lesbianism practiced in the home may impose a burden upon a child by reason of the "social condemnation" attached to such an arrangement, which will inevitably afflict the child's relationships with its "peers and with the community at large." *Roe* v. *Roe*, 228 Va. 722, 728, 324 S.E.2d 691, 694 (1985). We do not retreat from that statement; such a result is likely under these facts. Also, Wade has struck the child and, when there was a dispute over visitation, she has threatened violence when her views were not accepted.

Finally, the recommendation of the guardian ad litem in this case, while not binding or controlling, should not be disregarded. *Contra Matter of Baby K*, 832 F. Supp. 1022, 1031 n.2 (E.D. Va. 1993), *aff'd on other grounds*, 16 F.3d 590 (4th Cir. 1994), *cert. denied*, ____ U.S. ____, 115 S.Ct. 91 (1994) (recommendation of court-appointed guardian ad litem "irrelevant" to disposition of declaratory judgment proceeding to authorize withholding by hospital of infant's ventilator treatment). The duty of a guardian ad litem in a child custody dispute is to see that the interest of the child is "represented and protected." Code § 8.01-9. *See* Rule 8:6 (describing role of guardian ad litem appointed for child in juvenile and domestic relations district courts). This child had no other independent participant in the proceeding, aside from the trial court, to protect his interests. Thus, this diligent guardian ad litem's recommendation that custody be awarded to the grandmother was entitled to be considered by the court in reaching a decision on the issue.

■ Accordingly, we hold that the trial court, based on all the facts and circumstances, correctly ruled on the custody question. And, the study of the grandmother's home by the Chesterfield-Colonial Heights Department of Social Services determined there was "no reason" why she should not be awarded custody should the trial court make such a ruling.

Thus, the judgment of the Court of Appeals will be reversed and the case will be remanded, with directions that the Court of Appeals remand the case to the Circuit Court of Henrico County for reinstatement of that court's order of September 21, 1993 awarding custody of the child to Pamela Kay Bottoms.

*Reversed and remanded.*

JUSTICE KEENAN, with whom JUSTICE WHITING and JUSTICE LACY join, dissenting.

This Court has held, as the majority states, that a lesbian mother is not *per se* an unfit parent. *Doe v. Doe,* 222 Va. 736, 748, 284 S.E.2d 799, 806 (1981). Nevertheless, the majority ignores the trial court's refusal to follow this established law of the Commonwealth.

The record plainly shows that the trial court made a *per se* finding of unfitness based on the mother's homosexual conduct. The trial court stated:

I will tell you first that the mother's conduct is illegal. It is a Class 6 felony in the Commonwealth of Virginia. I will tell you that it is the opinion of this Court that her conduct is immoral. And it is the opinion of this Court that the conduct of Sharon Bottoms renders her an unfit parent.

The trial court added to this statement only by citing two other factors to support its custody award. These factors were the "social condemnation" that would "inevitably" affect the child, and "other evidence of the child being affected or afflicted with the evidence [sic] which is unrebutted of the cursing, the evidence of the child standing in the corner."

As the Court of Appeals properly recognized, "adverse effects of a parent's homosexuality on a child cannot be assumed without specific proof." *Bottoms v. Bottoms,* 18 Va. App. 481, 493, 444

S.E.2d 276, 283 (1994); *see also Doe*, 222 Va. at 746, 284 S.E.2d at 805. Although there is no evidence in this record showing that the mother's homosexual conduct is harmful to the child, the majority improperly presumes that its own perception of societal opinion and the mother's homosexual conduct are germane to the issue whether the mother is an unfit parent. Thus, the majority commits the same error as the trial court by attaching importance to factors not shown by the evidence to have an adverse effect on the child.

Additionally, I believe that this appeal cannot be resolved by imposition of final judgment. Since the trial court applied the wrong rule of law in this custody determination, this case must be remanded to the trier of fact, pursuant to *McEntire v. Redfearn*, 217 Va. 313, 316-17, 227 S.E.2d 741, 744 (1976), for application of the correct principles of law to all the evidence.

The majority's award of final judgment is doubly inappropriate under the holding of *McEntire*, because approximately 19 months have passed since the last evidentiary hearing in this case. In *McEntire*, the trial court had applied the wrong rule of law, and almost 18 months had passed since the last evidentiary hearing. This Court held that, based on the passage of that amount of time, "we are unable at this time properly to determine the issue of custody from the record before us. Accordingly, we will remand the case to the circuit court with direction to hold forthwith another hearing . . . applying the law in a manner consistent with this opinion." 217 Va. at 317, 227 S.E.2d at 744.

In the present case, the same disposition is required. Thus, I would affirm the Court of Appeals' holding that the trial court erred in applying a *per se* rule of parental unfitness based on the mother's homosexual conduct, but would reverse its imposition of final judgment and remand this matter to the trial court for further proceedings.