IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 20, 2000 Session

## In re ADOPTION OF M.J. S.

**Direct Appeal from the Chancery Court for Shelby County**
**Nos. A5151-1, A5153-3(1)   Walter L. Evans, Chancellor**

————————

**No. W1999-00197-COA-R3-CV - Filed October 5, 2000**

————————

HEWITT P. TOMLIN, JR., Sp. J., dissenting.

For the several reasons hereafter set out, I respectfully dissent from the majority opinion of my colleagues. It is my firm opinion that the chancellor below committed at least three reversible errors. First, he erred in dismissing the adoption petition of the Snyders on a motion for summary judgment. For the reasons I shall set out later, the Snyders' petition for adoption should have been allowed. The adoption petition of the Snyders is specifically exempted from the custody requirement as later set forth in the adoption statutes.

Furthermore, in my opinion a review of this  record clearly shows that the evidence preponderates against the finding of the chancellor that it was in this young child's best interest to be adopted by the petitioner Langston, an open, practicing lesbian who at that time had an ongoing sexual relationship of several years with another lesbian, who also resided with Langston in a residence owned by the two of them.

Lastly, the chancellor by his handling of this case showed lack of familiarity with the general law in cases such as this that mandates that it is the court's obligation to see to it that the child's best interest *be paramount at all times*.

## A.  Appellants' standing to proceed on intervening petition for adoption

The majority affirms the trial court's finding that the Snyders lacked standing to proceed on their intervening petition for adoption because they failed to satisfy the custody requirement of the adoption statutes. This custody requirement is set out in Tennessee Code Annotated Section 36-1-116 (b)(5), which states that the adoption petition must state "that the petitioners have physical custody of the child or that they meet the requirements of §36-1-111 (d)(6) [regarding validity of surrenders], and from what person or agency such custody was or is to be obtained." Tenn. Code

Ann. § 36-1-116 (b)(5) (Supp. 1998). However, Tennessee Code Annotated Section 36-1-115 (b) specifically exempts from this custody requirement those filing an intervening petition to adopt a child. *See* Tenn. Code Ann. § 36-1-115 (b) (1996).

Acknowledging that Section 36-1-115(b) exempts an intervening petitioner from the custody requirement at the time the petition is filed, the majority finds that the grandparents had standing to file an intervening petition for adoption. However, despite finding that the grandparents had standing to *file* an intervening petition for adoption, the majority finds that they had no standing to *proceed* with their petition because they were unable to meet the custody requirement of the adoption statutes. The majority interprets Tennessee Code Annotated Section 36-1-116 (f)(1) "to mean that, in cases where an intervening adoption petition has been filed, neither the original petitioners nor the intervening petitioners will be granted an adoption of the child unless the trial court finds that the petitioners have either physical custody of the child or the right to receive custody of the child pursuant to a validly executed surrender." Based on this interpretation, the majority concludes that "in order to prevail on their petition to adopt the child, the intervening petitioners must meet the statutes' custody requirement at some point in the adoption proceedings."

I respectfully disagree with the majority's interpretation of Section 36-1-116(f)(1), and believe it to be erroneous. When construing a statute, the court's role is to give effect to legislative intent. *Schering-Plough Healthcare Products, Inc. v. State Bd. of Equalization*, 999 S.W.2d 773, 775 (Tenn. 1999). That intent can best be ascertained from the plain and ordinary meaning of the language used, without "forced or subtle construction that would limit or extend the meaning of the language." *Id.* Whenever possible, every word and phrase of a statute is to be given meaning. *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 345 (Tenn. Ct. App. 1997). I think that a careful reading of the statute, with attention focused on each phrase and the placement of commas, reveals an entirely different meaning from that found by the majority. Tennessee Code Annotated Section 36-1-116(f)(1) states:

> Upon the filing of the petition, the court shall have exclusive jurisdiction of all matters pertaining to the child, including the establishment of paternity of a child pursuant to chapter 2, part 1 of this title, except for allegations of delinquency, unruliness or truancy of the child pursuant to title 37; provided that, *unless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners*, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6).

Tenn. Code Ann. §36-1-116 (f)(1)(Supp.1998)(emphasis added).

Although the statute is awkwardly worded, I am of the opinion that by the plain meaning of its words, the statute clearly expresses that although a court ordinarily has no jurisdiction to grant an adoption when the petitioner cannot show either that he has custody of the child or the right to receive custody pursuant to a valid surrender, an exception exists in the case of an intervening petitioner, where the child sought to be adopted is already in the custody of the original petitioners. Moreover, this interpretation is consistent with the language of Tennessee Code Annotated Section 36-1-115 (b), which states:

> (b) The petitioners must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6) at the time the petition is filed, *unless they are filing an intervening petition seeking to adopt the child.*

Tenn. Code Ann. § 36-1-115(b) (1996)(emphasis added).

The majority asserts as support for its interpretation of the statute the custody requirement of Tennessee Code Annotated Section 36-1-116 (b)(5) regarding the contents of a petition to adopt. However, in finding that the Snyders had standing to file an intervening petition to adopt the child, even though they were unable to meet the custody requirement of the statute, the majority has in essence acknowledged that the custody requirement of Tennessee Code Annotated 36-1-116 (b)(5) does not apply to an intervening petitioner. While acknowledging that the statute's custody requirement does not apply to an intervening petition to adopt, the majority nevertheless concludes that the adoption statutes require that the intervening petitioner, in order to prevail in his adoption petition, must at some point in the proceedings show that he either has custody or has the right to receive custody.

A statute should be construed, when possible, so that its component parts are consistent and reasonable. *State v. Odom*, 928 S.W.2d 18, 30 (Tenn. 1996); *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996). A specific statutory provision controls over a more general one. *Niziol v. Lockheed Martin Energy Sys., Inc.*, 8 S.W.3d 622, 624 (Tenn. 1999); *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn. 1998). Statutes should be construed in the light of reason. *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 345 (Tenn. Ct. App. 1997).

That being the case, Tennessee Code Annotated Section 36-1-116 (b), which sets forth the general requirements for "a petition to adopt," gives way to the language of Tennessee Code Annotated Sections 36-1-115 (b) and 36-1-116 (f)(1), which specifically state that an intervening petitioner does not have to meet the custody requirement either to file an intervening petition to adopt, or to be granted an adoption under an intervening petition. *Compare* Tenn. Code Ann. § 36-1-116 (b)(6) *with* Tenn. Code Ann. §§ 36-1-115 (b) *and* 36-1-116 (f)(1) (1996 & Supp. 1998). This is the only construction of the statutes which makes sense, and which gives effect to the statutes as a whole.

The majority contends that its interpretation of Tennessee Code Annotated Section 36-1-116(f)(1) is further bolstered by Tennessee Code Annotated Section 36-1-120(a)(4), regarding the court's final order of adoption. This section, however, supports the majority's interpretation of the statute only if the majority's interpretation is first presumed to be correct. Section 36-1-120 (a)(4) requires that the court include in its final order of adoption "[t]he date when the petitioners acquired physical custody of the child and from what person or agency or *by which court order*." Tenn. Code Ann. § 36-1-120 (a)(4)(1996)(emphasis added). If the court, under Tennessee Code Annotated Section 36-1-116 (f)(1), has the authority to grant an adoption and issue orders of custody to an intervening petitioner in cases in which the child is already in the custody of the original petitioners, then the court's final order of adoption and custody will serve as the court order by which the intervening petitioners receive custody.

I am of the opinion that the trial court erred in dismissing the Snyders' petition to adopt the child. In my view, the trial court should have consolidated both parties' petitions to adopt in one trial. In its determination of what would be in the best interests of the child, the court should have compared the two prospective adoptive homes that were available, conducting a thorough analysis of the fitness of each party, including each party's ability to provide for the moral growth and welfare of this young child.

Tennessee case law supports the use of a comparative fitness type of analysis, similar to that used in custody proceedings, to determine the best interests of a child in an adoption proceeding in which there is more than one party seeking to adopt the child. In *Hale v. Brewer*, No. 03A01-9301-CV-00054, 1993 WL 328061 at * 1(Tenn. Ct. App. Aug. 18, 1993), the trial court, simultaneously considering competing petitions to adopt filed by two different parties, compared the two prospective adoptive parties and homes in seeking to determine the best interests of the children. *Id.* at * 2. The children in *Hale* were siblings, orphaned by the murder-suicide of their mother and father. The children were placed in the custody of their maternal grandmother and her husband. *Id.* at * 1. Subsequent to the grandmother's award of legal custody, the children's paternal aunt and her husband petitioned to adopt the children. *Id.* The grandmother counter-claimed for adoption. After comparing the merits of each home, including the lifestyles of the parties, the trial court granted the aunt's petition to adopt, denying the grandmother's petition. *Id.* at * 2. The Court of Appeals affirmed, finding that evidence presented in the case, which included proof of the aunt's stable marriage and the grandmother's history of adultery, did not preponderate against the trial court's decision that placement with the aunt served the best interests of the children. *Id.*

Similarly, in *In re Adoption of Hart*, 709 S.W.2d 582 (Tenn. Ct. App. 1984), both the trial court and the reviewing court on appeal engaged in a comparison of two parties competing for custody to determine if the proposed adoption was in the child's best interests. In this case, the child's biological mother had executed a surrender of her child to a middle-aged couple, who then filed a petition to adopt. The child's great-grandparents, who had previously been awarded legal custody of the child, petitioned to intervene in the adoption, seeking the return of the child to their custody. *Id.* at 583. After comparing the two prospective homes available to the child, the trial court granted the couple's petition to adopt. The great-grandparents appealed. In affirming the trial

court's decision, the Court of Appeals clearly engages in a comparative fitness analysis of the two parties:

> The proof introduced at trial on this issue [regarding the best interest of the child] indicated that both families could provide an adequate home for the child. There was no testimony or other proof that the appellees or the appellants had ever neglected children or were likely to do so in the future. Further, the proof did not indicate that any of the parties to the litigation were morally unfit to raise a child. And while the record indicates that the appellees may have a more affluent lifestyle than the appellants, it cannot be said that the appellants could not provide adequate financial support for Stephanie.
>
> However, two important factors support the decision rendered by the trial court. First, the appellees are a middle aged couple. They can be expected to remain in good health until the child is emancipated. The appellants are an elderly couple. Mr. Guthrie testified that he was seventy-three years old at the hearing of this matter (more than a year ago). He added that he was seven years older than his wife.
>
> But perhaps an even more serious impediment to the appellants' demands is their failure to initiate an adoption proceeding of their own. In their petition to intervene, the appellants sought only to prevent Stephanie's adoption by the appellees and to regain custody of the child. Regardless of the reason for the appellants' failure to seek an adoption, we believe it is preferable that a permanent home be found for Stephanie.

*Id.* at 585.

The trial court, before approving a proposed adoption, has the duty to find not only that the prospective parents are fit, but also that the adoption is in the best interests of the child. *In re Adoption of Singleton*, 1985 WL 3544, at * 1 (Tenn. Ct. App. Nov. 8, 1985). In seeking to determine whether the best interests of the child will be served by the adoption, the trial court is specifically charged with the "duty of protecting the child and those interests and *to bring those interests fully before the court*." *Id.* (citing 2 Am. Jur. 2d, *Adoption*, § 58) (emphasis added). I do not think that a true best interests analysis for this child could be conducted without the trial court's consideration of the alternative home that was available. By failing to consider the grandparents' competing claim on this child, the trial court ignored vital information that was pertinent to a determination of this child's best interests. *See Hale v. Brewer*, No. 03A01-9301-CV-00054, 1993 WL 328061 at * 1(Tenn. Ct. App. Aug. 18, 1993); *In re Adoption of Hart*, 709 S.W.2d 582 (Tenn. Ct. App. 1984). Therefore, I would reverse the trial court's grant of summary judgment to Langston on the Snyders' intervening petition to adopt, and remand for a full hearing to determine whether the best interests of the child is best served by placing him with his grandparents.

***B. The Best Interests of the Child***

Assuming, *arguendo*, however, that the majority's interpretation of the pertinent statutes is correct, and that the trial court did not err in dismissing the Snyders' intervening petition to adopt based on their failure to meet the statutes' custody requirement, I would still reverse the trial court on the basis that the preponderance of the evidence does not support a finding that adoption into a lesbian household, under the circumstances presented by the proof, is in the best interests of this child.

In an adoption proceeding *the welfare and best interests of the child is always of paramount importance*. **Sonet v. Unknown Father of J. D. H.**, 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990); **In re Adoption of Hart**, 709 S.W.2d 69, 71-72 (Tenn. Ct. App. 1984). In the event of a conflict between the interests of the child and the interests of an adult, the child's best interests is to take precedence. *See* Tenn. Code Ann. § 36-1-101(d) (Supp. 1999).

From the evidence presented at trial, there can be little doubt that adoption by Langston will result in this child being reared in a lesbian "family." Langston testified that she and her "roommate," Angela Craig ("Ms. Craig") were "close committed friends" who intended "to live together forever." Langston admitted that she and Ms. Craig had lived together for the past seven and a half years. She acknowledged that she and Ms. Craig co-owned a home together, and that Ms. Craig's name was on the deed to the house. Langston further testified that she wanted to have the name "Craig" added as part of the child's name, because "it was very important to me that I have the name of somebody that I cared about and thought a lot about to be in there."

Ms. Craig testified that she and Langston had been involved in a romantic, sexual relationship until April or May of 1998. Ms. Craig candidly admitted that their sexual activity had ceased because of Langston's desire to adopt a child. This elimination of sexual activity from their lives coincidentally took place about the time that Langston filed her petition to adopt. Ms. Craig said, however, that she and Langston were presently "evaluating that relationship." Ms. Craig was unwilling to rule out the possibility that they might resume their sexual activity at some point, stating, "I can't predict what is going to happen in the future." She said that if they were to resume their sexual activity they would not be sexual in front of their children. Notably, however, she did *not* say that they would not be demonstrative towards each other in front of the children, stating that "[the child] will know that we are very good friends and friends are loving towards one another. Now, sexual and loving are two different things."

Ms. Craig admitted that she had played an "active role" in the adoption. She acknowledged that she had contacted attorneys on Langston's behalf, accompanied the birth mother on her visits to the doctor, been present at the hospital when the child was born, and been present at the restaurant when the birth mother delivered the child to Langston.

Both Langston and Ms. Craig stated that they did not date men. When asked if she anticipated ever marrying, Ms. Craig replied: "[N]othing is beyond consideration. As I said, we are in the process of evaluating that relationship that I have testified to and that, quite honestly, I have no shame about from the past."

The clear picture that emerges from the trial is that Langston and Ms. Craig are lesbians, and that they have been living in a sexual, pseudo-marriage relationship with each other for a number of years. According to Langston, the two women were very close friends, and intended to live together forever. Ms. Craig pushed Langston to adopt this child, and played an active role in the entire adoption process. Ms. Craig cares for the child when Langston is at work. The women's sexual relationship, by Ms. Craig's account, ended only in April or May of 1998, at approximately the same time that the birth mother delivered the child to Langston. At the time of the trial, the women were reevaluating their decision to cease their sexual activity, and Ms. Craig admitted that there was a possibility that they would resume having sex with one another in the future. Ms. Craig stated that she felt no shame about their sexual relationship. The only reasonable inference that can be drawn from these facts is that the child, if allowed to remain with Langston, will be raised in a household consisting of open, practicing lesbians who will co-parent the boy. In my view, such an arrangement cannot be and is not in the best interests of any child.

Although this court has not had previous occasion to address the issue of a homosexual adoption, this court has addressed the homosexuality of one desiring to be a custodial parent, in a post-divorce custody dispute. ***Collins v. Collins***, 1988 WL 30173, at * 3 (Tenn. Ct. App. Mar. 30, 1988). In ***Collins*** the trial court granted the father's petition to have custody of the parties' nine-year-old daughter changed from the mother to himself, based on the mother's post-divorce lesbian lifestyle. ***Id.*** at * 1. On appeal, the mother argued that the trial court erred in basing its award of custody solely on her homosexuality, without proof of the harmful effects that lifestyle had on the child. ***Id.*** at * 2. We affirmed, finding that, although there was no proof that the child had as yet been harmed by her mother's lifestyle, she faced possible social ostracism and contempt if she remained with the mother:

> Both parties obviously love their daughter. Mother has done a good job in raising her to be a normal, well-adjusted child, and there has been no proof that the Mother's lifestyle has adversely affected the child's growth or development. However, if the child remains with her mother, she faces a life that requires her to keep the secret of her mother's lifestyle, or face possible social ostracism and contempt. This adds tremendous pressure to a young child's life. When the welfare of the child is at stake, the Court is not required to wait until obvious damage is done.

***Id.*** at * 3. The ***Collins*** Court did not, however, affirm the trial court's order of custody based on the mother's homosexual lifestyle alone. Instead, the ***Collins*** Court engaged in a comparative fitness analysis, finding that the mother was not unfit, but that the father was comparatively more fit, due in large part to his stable marriage and heterosexual lifestyle. ***Id.*** This writer felt constrained to write a separate concurring opinion in the ***Collins*** case precisely because the majority failed to squarely address the issue of the fitness of an active homosexual to be a custodial parent. I anticipated cases such as the one presently before this court, in which courts of this state would "be faced with the issue of the homosexuality of a custodial parent or one desiring to be a custodial parent." ***Id.*** at * 4 (Tomlin, P.J., concurring). As I stated in ***Collins***:

The courts of this state have a duty to perpetuate the values and morals associated with the family and conventional marriage, inasmuch as homosexuality is and should be treated as errant and deviant social behavior. I would have this Court declare under this or a similar set of facts that a practicing homosexual parent be disqualified from obtaining legal custody of one's minor child or children. While a child the age of parties' daughter is too young to emulate her mother's conduct, to hold otherwise would be adopting a "wait and see" attitude and would endanger the child's moral development. It is too great a risk to postpone taking action to safeguard the moral well being of children until one sees tangible manifestations of harm to their characters.

*Id.* at * 11.

A majority of other jurisdictions do not support the adoption of children by open homosexuals. *See* Karla J. Starr, Note, *Adoption by Homosexuals: A Look at Differing State Court Opinions*, 40 Ariz. L. Rev. 1497, 1498 (1998); *See also* David L. Chamber and Nancy D. Polikoff, *Family Law and Gay and Lesbian Family Issues in the Twentieth Century*, 33 Fam. L. Q. 523, 540 (1999). Florida has a statutory prohibition against homosexuals adopting. *See* Fl. St. Ann. § 63.042(1997). New Hampshire's statutes, until last year, provided an absolute bar against homosexuals adopting or acting as foster parents. *See* N.H. Rev. Stat. Ann. § 170-B:2 to B:4, 170-F:2 to F:6 (1994)(repealed 1999). It has only been in the past decade that some jurisdictions have begun to allow an openly gay or lesbian individual to adopt. Notably, however, by far the majority of these cases involve so called "second parent adoptions," in which the homosexual partner of the child's biological parent seeks to adopt the biological parent's child. *See, eg., In re Adoption of T.K.J. & K.A.K.*, 931 P.2d 448 (Colo. Ct. App. 1996); *In re Christine G.*, 644 N.Y.S.2d 1016 (App. Div. 1996); *In re M.M.D. v. B.H.M.*, 662 A.2d 837 (D.C. 1995); *In re Adoption of Two Children by H.N.R.*, 666 A.2d 535 (N.J. Super. Ct. App. Div. 1995); *In re K.M. & D.M.*, 653 N.E.2d 888 (Ill. App. Ct. 1995); *In re Jacob*, 636 N.Y.S.2d 716 (N.Y. 1995); *Adoption of Tammy*, 619 N.E. 2d 315 (Mass. 1993). Cases which allow homosexual "stranger" adoptions are rare, and primarily involve special needs or handicapped children who usually have no other viable options for adoption. *See In re Adoption of Jessica N.*, 609 N.Y.S.2d 209, 209 (App. Div. 1994)(allowing lesbian to adopt child with birth defects she had cared for since child was four months old); *In re Adoption of Charles B.*, 552 N.E.2d 884, 890 (Ohio 1990)(permitting homosexual man to adopt emotionally disturbed, brain-damaged child with leukemia whom he had counseled for several years); *In re Commitment of J.N.*, 601 N.Y.S.2d 215, 216, 218 (allowing lesbian foster mother to adopt child born with birth defects and addiction to cocaine).

An examination of custody cases, which, like adoptions, are determined on a case by case basis under the "best interests of the child" standard, reveals the generally negative view that other jurisdictions have taken of homosexual parenting, and its effects upon children. In a 1985 case involving a custody dispute between a heterosexual mother and homosexual father, the Virginia Supreme Court found that the father's openly gay lifestyle rendered him unfit to have custody. *Roe v. Roe*, 324 S.E.2d 691, 693. (Va. 1985). The *Roe* Court stated:

> [W]e have no hesitancy in saying that the conditions under which this child must live daily [in an openly homosexual household] are not only unlawful but also impose an intolerable burden upon her by reason of the social condemnation attached to them, which will inevitably afflict her relationships with her peers and with the community at large. The father's unfitness is manifested by his willingness to impose this burden upon her in exchange for his own gratification.

*Id.* at 728 (citations omitted).

The Virginia Supreme Court reaffirmed that position in *Bottoms v. Bottoms*, 457 S.E.2d 102 (Va. 1995), a custody dispute between a child's lesbian mother and his grandmother. The trial court found that it was in the child's best interest to be placed with his grandmother. The Virginia Court of Appeals reversed. The decision of the Court of Appeals, in turn, was reversed by the Virginia Supreme Court, which reinstated the trial court's award of custody to the grandmother. In affirming the trial court's decision, the Virginia Supreme Court noted that the factors to be considered in determining the unfitness of a parent "include the nature of the home environment and moral climate in which the child is to be raised." *Id.* at 107. The Court found that the mother's open lesbian relationship could not be ignored in the determination of the child's custody:

> And, we shall not overlook the mother's relationship with [her lesbian lover], and the environment in which the child would be raised if custody is awarded to the mother. We have previously said that living daily under the conditions stemming from active lesbianism practiced in the home may impose a burden upon the child by reason of the "social condemnation" attached to such an arrangement, which will inevitably afflict the child's relationships with its "peers and with the community at large." *Roe v. Roe*, 228 Va. 722, 728, 324 S.E.2d 691, 694 (1985). We do not retreat from that statement; such a result is likely under these facts.

*Id.* at 108.

In *Ex parte J.M.F.*, 730 So.2d 1190 ( Ala. 1998), the Supreme Court of Alabama affirmed a trial court's change of custody from a mother to a father, based in part on the mother's active and open lesbian lifestyle. *Id.* at 1191. The mother was originally awarded custody of the parties' young daughter when the parties divorced. Soon after the divorce, the mother entered into a lesbian relationship with another woman, who shared the home with the mother and child. The father subsequently remarried. The father petitioned for custody when he learned that the mother and her lover were not concealing their relationship from the child, but instead were openly displaying their lesbian lifestyle, presenting themselves to the child and others as "life partners" in a relationship similar to that of a married couple. *Id.* at 1192. The trial court, based on the father's remarriage and the mother's openly lesbian lifestyle, granted the father's petition. The Court of Appeals reversed. The Alabama Supreme Court reinstated the trial court's award of custody to the father. Although the Court did not base its decision solely on the openly homosexual lifestyle of the mother, it acknowledged that such a lifestyle could have detrimental effects on a child:

> While the evidence shows that the mother loves the child and has provided her with good care, it also shows that she has chosen to expose the child continuously to a lifestyle that is "neither legal in this state, nor moral in the eyes of most of its citizens." *Ex parte D.W.W.*, 717 So.2d 793, 796 (Ala. 1998). The record contains evidence from which the trial court could have concluded that "[a] child raised by two women or two men is deprived of extremely valuable developmental experience and the opportunity for optimal individual growth and interpersonal development" and that "the degree of harm to children from the homosexual conduct of a parent is uncertain . . .and the range of potential harm is enormous."
> Lynn D. Wardle, The Potential Impact of Homosexual Parenting on Children, 1997 U. Ill. L. Rev. 833, 895 (1997).

*Id.* at 1196.

These and other similar cases indicate that a parent's homosexual lifestyle is a factor that should be considered in the determination of the best interests of a child subject to a custody dispute. *See, eg., Weigand v. Houghton*, 730 So.2d 581, 586 (Miss. 1999) (finding that homosexuality of father, having bearing on his moral fitness, was relevant to determination of child custody); *J.A.D. v. F.J.D.* ,978 S.W.2d 336, 339 (Mo. 1998)(*en banc*)(holding that it was not error to consider impact of parent's homosexuality on children in custody determination);*Pulliam v. Smith*,501 S.E.2d 898, 904 (N.C. 1998) (finding that open nature of father's homosexuality, which included hand-holding and kissing lover in presence of children, likely to create emotional difficulties for children).

A most enlightening and judicially balanced law review article, entitled "The Potential Impact of Homosexual Parenting on Children" by Professor Lynn D. Wardle, is found in the 1997 University of Illinois Law Review. Lynn D. Wardle, *The Potential Impact of Homosexual Parenting on Children*, 1997 U. Ill. L. Rev. 833 (1997). As have the authorities cited herein, Professor Wardle notes that "the core concern in parental relationship cases must be the welfare of children." *Id.* at 843.

Wardle examined a study dealing with the impact of being raised by lesbian or gay parents, a study touted by those favoring the parental rights of homosexuals. Wardle noted that "studies indicate that children raised by parents engaged in homosexual relationships are at a substantially greater risk (at least 3.5 to 7 times heightened risk) of being drawn into homosexual behavior themselves." *Id.* at 850.

Wardle also cites some of the indicia of the needs for and advantages of dual-gender parenting. He writes:

> Children raised by homosexual couples do not have both a father and a mother. If Heather is being raised by two mommies only, she is being deprived of the experience of being raised by a daddy. Both the common experience of humanity

and recent research suggest that a daddy and a mommy together provide by far the best environment in which a child may be raised.

*Id.* at 858.

Lastly, Professor Wardle provides some interesting data concerning four independent Scandinavian nations--Denmark, Norway, Sweden and Iceland--and how each one has dealt with same-sex domestic partnerships as well as child rearing rights. In Iceland, same-sex couples may enter into same-sex relationships, but are excluded from adoption and artificial insemination. In Denmark the same-sex couple may not adopt a child. In Sweden, same-sex domestic partnerships are excluded from adoption, joint custody, and fertilization in vitro. In Norway, same-sex registered partnerships may not adopt. As observed by Professor Wardle: "These nations take great care to prevent adults from subjecting children to some potentially detrimental effects and consequences of adult sexual preferences." *Id.* at 891.

If the homosexuality of a parent is relevant to the best interests of a child in a custody dispute between biological parents, then *a fortiori* the homosexuality of a prospective adoptive parent must certainly be relevant to a determination of the best interests of a child in an adoption proceeding. This is especially true in a case such as the one at bar, where the homosexual adoptive parent is not in any way biologically related to the child. This child was not born to a homosexual parent. By granting Langston's adoption petition, the trial court is forcing this innocent child, who is unable to speak on his own behalf, into a "family" which most of society still views as immoral and unnatural. Anne McGinnis ("McGinnis"), the licensed clinical social worker hired by Langston to prepare a home study report for the trial court, testified that she had been aware of the nature of Langston and Ms. Craig's relationship at the time that she prepared the report. However, she intentionally did not include that information in her report to the court, because she did not believe it was relevant to Langston's fitness as a parent. McGinnis stated that, in her opinion, it would matter only if the sexual activity were conducted in the presence of the child because "what they do in their private life and their sexual behavior is not impacting on this child. This child does not see it."

This is a hopelessly unrealistic view. Although the child may be too young at present to understand and appreciate the deviant lifestyle of Langston and Ms. Craig, it will undoubtedly have an effect on him as he grows and matures, regardless of whether the women are "sexual" in his presence, or merely "loving" towards one another. We cannot ignore the greater society in which this child will live. His classmates, or at least some, will almost certainly taunt him. Parents of other children may refuse to allow their children to visit or play in his home. He will be subjected to stares and whispers, at the very least, when he goes out into public with his two "mothers." Above and beyond all the social pressures, however, is the fact that he will be reared to believe that homosexuality and a homosexual partnership is an acceptable alternative to heterosexuality and marriage. I would reverse the trial court's decree of adoption, and dismiss Langston's petition for adoption. Upon remand the trial court is respectfully directed to reinstate the Snyders' petition and to conduct a hearing on same in accordance with the applicable law.

Fortunately, cases of this type come along at rare intervals.  The young--very young--child who is the subject of these adoption proceedings has NO ONE representing or specifically committed to looking out for his interests.  As a small baby he was surrendered by his natural mother, for some or no consideration, to a lesbian who wished to adopt him.  The identity of his father was unknown.  His mother was finished with him.  If there ever was a case that called for the appointment of a guardian *ad litem*, this was it.  The trial court made no such appointment, nor did it inquire of the need for one.  Upon remand the chancellor should call on all his resources to determine what is in this little child's best interests.

_____
HEWITT P. TOMLIN, JR.