Present:  All the Justices

COOPER INDUSTRIES, INC., ET AL.

v. Record No. 992957  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        November 3, 2000
ANDRES MELENDEZ

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John C. Morrison, Jr. Judge

In this product liability case, we address issues
concerning proximate causation, misuse of a product, the
statute of repose, and a trial court's discretion to send a
jury back for further deliberations when a juror expresses
disagreement with the verdict during a poll of the jury.
Because we find no error, we will affirm the judgment of
the circuit court, which was in accordance with a jury
verdict in favor of the injured plaintiff.

MATERIAL PROCEEDINGS

This product liability action arose out of an
explosion of an industrial circuit breaker, known as a K-
Don 600 amp circuit breaker, located in Vault 21 of Pier 23
at the Norfolk Naval Base on June 1, 1994.  The explosion
occurred as Andres Melendez, Jr., a civil employee of the
Navy's Public Works Center, his supervisor, and a co-worker
were "racking" or installing the circuit breaker in an

energized switchgear.[1]  As a result of the explosion,

Melendez and his supervisor were seriously burned, and the

co-worker was killed.

Melendez filed a motion for judgment in the circuit

court alleging negligence, breach of implied warranty, and

strict liability against Cooper Industries, Inc., Arrow

Hart, Inc., and Crouse-Hinds Co. (collectively Cooper), the

manufacturer of the switchgear at issue in this case.[2]  In

its grounds of defense, Cooper raised an affirmative

defense that Melendez's action was barred by the applicable

statute of repose, Code § 8.01-250.  Over Melendez's

objection that the plea in bar involved disputed factual

questions to be resolved by a jury, the circuit court

---

[1] The Public Works Center had responsibility for all utilities and maintenance at the naval base.

[2] Arrow Hart actually manufactured the switchgear. However, Cooper is the successor in interest to Arrow Hart and Crouse-Hinds.  Accordingly, we will use the name "Cooper" in this opinion even though certain references in the record are to Arrow Hart.

Melendez named several other defendants in the motion for judgment, including Gould Electronics, Inc. and I.T.E. Imperial Corp. (collectively ITE), manufacturers of the circuit breaker; Glastic Corporation, manufacturer of insulation used in the switchgear and circuit breaker; and Westinghouse Electric Corporation, the company that retrofitted circuit breakers for the Navy.  However, these defendants settled with Melendez before trial.  Thus, Cooper was the only defendant at trial.

Melendez also nonsuited his negligence and strict liability claims, leaving only the claim for breach of implied warranty for trial.

conducted an evidentiary hearing and concluded that the statute of repose does not apply.  Because one of Cooper's witnesses, Robert L. Smith, could not be present for that proceeding, the court agreed to reconsider the issue after hearing Smith's testimony at trial.

Following several days of trial, a jury returned a verdict in favor of Melendez in the amount of $5,000,000.  After the court announced the verdict, Cooper requested a poll of the jurors.  During that poll, one juror responded "No" when asked if that was his verdict.  The court then instructed the jurors, "Well, ladies and gentleman, you're going to have to return to your jury room at this point.  I had instructed you previously that your verdict must be unanimous."  At that point, the foreperson of the jury stated, "It was unanimous, Your Honor, when we was [sic] in that jury room."  Thereupon, the court stated, "Ladies and gentleman, step back into your jury room, please."  Cooper immediately moved for a mistrial.  After approximately two minutes, the jury returned to the courtroom with the same verdict as the original.  The court polled the jurors again, and this time, each juror, including the one who initially answered "No," responded "Yes, your Honor" to the question, "Is that your verdict?"

Following the trial, Cooper renewed its motion for a mistrial based on the result of the first jury poll and also moved to set aside the jury verdict on numerous grounds, including the issue regarding the statute of repose. After considering briefs and argument on both motions, the circuit court denied the motions and entered judgment in favor of Melendez in accordance with the jury verdict.[3]

In a letter opinion, the court explained its reasons for concluding, once again, that the statute of repose does not apply. Rejecting Cooper's comparison of the switchgear and circuit breaker at issue in this case to an electric panel box used in a private residence, the court concluded that the switchgear and circuit breaker are "equipment or machinery" within the purview of Code § 8.01-250 and not ordinary building materials. The court described the switchgear, which is designed to hold 10 circuit breakers, as a "metal cabinet . . . 8'6" in height, 8'9" wide, and 5'2" deep." The court further stated that the circuit breaker "measure[d] 20.5" in height, 26.5" deep, and . . . 14" wide."

---

[3] In its judgment order, the court set off the sum that Melendez had received in settlement from other defendants against the amount of the jury verdict. See n. 2, supra.

4

Continuing, the court advised the parties that it had considered an owner's manual and instructions regarding the installation and use of the circuit breaker in question, a shop drawing prepared by Cooper depicting the switchgear, and the Navy's contract specifications for the equipment.[4] The court noted that the detailed instructions included in the owner's manual probably would not have been provided for ordinary building materials. The court further reasoned that the Navy's specifications, such as the direction to put nameplates on the equipment showing, among other things, the manufacturer's name; to supply "a switchgear with drawout (removable) circuit breakers"; to provide equipment that is "established standard tested products of the manufacturer, thoroughly coordinated and integrated by the manufacturer [with] the ratings of all equipment and components . . . guaranteed and published by the manufacturer"; and "[t]o factory test and certify the primary and secondary (circuit breaker portion) switchgear sections" tended to remove the items in question from the category of ordinary building materials.

---

[4] The court stated that it was considering the instruction manual solely for the fact that such a manual existed because there had been other issues during the trial regarding the manual.

We awarded Cooper this appeal on the following assignments of error: (1) that the circuit court erred in refusing to set aside the jury verdict because Melendez did not establish a causal connection between the alleged breach of warranty and his injuries; (2) that the court erred in refusing to set aside the verdict because both Melendez and the Navy misused the electrical gear; (3) that the court erred in deciding that the statute of repose does not bar Melendez's action to recover for his bodily injuries; (4) that the circuit court erred in refusing to grant a mistrial when a juror responded "No" during the poll of the jury because the responses showed that the verdict was not unanimous; and (5) that the court erred in denying Cooper's motion for a mistrial because the court's instructions to the jury after the poll "in essence required unanimity."

### FACTS

In accordance with well-established principles, we recite the facts in the light most favorable to Melendez, the prevailing party at trial. Rice v. Charles, 260 Va. 157, 161, 532 S.E.2d 318, 320 (2000). "The verdict of the jury in favor of [Melendez], upon which the trial court entered judgment, settles all conflicts of testimony in [his] favor and entitles [him] to all just inferences

6

deducible therefrom. Fortified by the jury's verdict and the judgment of the court, [he] occupies the most favored position known to the law." Pugsley v. Privette, 220 Va. 892, 901, 263 S.E.2d 69, 76 (1980) (citing Tri-State Coach Corp. v. Walsh, 188 Va. 299, 303, 49 S.E.2d 363, 365 (1948)).

In the late 1970's, the Navy undertook a renovation of its piers, including Pier 23, at its naval base in Norfolk. With the advent of a nuclear-powered Navy, the existing electrical services on the piers were not adequate to meet the electrical demands of the changing fleet. That renovation took place 17 years before the explosion at issue in this case.

Pier 23, where the explosion occurred, originally contained three electrical vaults referred to as "Vaults 1, 2, and 3." During the renovation, three additional vaults were added, and the switchgear in each of the existing vaults was upgraded to match the switchgear being installed in the new vaults. Those new vaults were numbered 20, 21, and 22. Vault 21 contained the circuit breaker that exploded.

The top of Pier 23 is a deck where trucks and machinery can be driven and on which people can walk. One of the Navy's goals during the renovation was to remove any

7

obstructions on the deck in order to accommodate the traffic on the pier needed to supply and maintain ships and submarines. Thus, according to Cooper's witness, Robert L. Smith, a retired electrical engineer who prepared the design drawings of the electrical system for the renovation project, the plan was to remove switchgear from the top of the pier's deck and place it underneath the pier.[5]

A switchgear, such at the one located in Vault 21, is a large metal enclosure that contains many component parts, including circuit breakers. Electrical power flows into the switchgear through a circuit breaker and goes out via a large cable on top of the pier to a submarine docked at the pier. One end of the cable is plugged into a receptacle located in a box, called a "turtle back," that sits on the deck, and the other end is connected to the submarine. The purpose of this system is to enable a submarine to be moored at the pier and draw electrical power from the shore instead of having to run its engines and generators to supply electrical power.

Cooper's expert witness, Roger Bledsoe, agreed as to the purpose of the electrical system. He testified at the

---

[5] At the time of the renovation, Smith worked for an engineering firm that had contracted with the Navy to provide the design plans and specifications for the renovation project.

hearing on the statute of repose that the switchgear in this case was to provide electrical power "from the land" to a submarine docked at the pier. When asked whether the switchgear and circuit breaker served any function with regard to the pier, Bledsoe responded, "That's what it sounds like. It sounds like it's through the ship."

John Kuzmack qualified as an expert on the subject of circuit breakers at the hearing on the statute of repose. He had previously worked for the manufacturer of the ITE K-Don circuit breaker at issue in this case. Kuzmack testified that a K-Don circuit breaker serves the same basic function as a circuit breaker used in a house, except that the K-Don breaker is significantly larger. The circuit breaker at issue was a finished product, tested at the factory before it left the manufacturer. Although the circuit breaker and switchgear were normally shipped in separate containers to the site where they would be used, the circuit breaker had only to be plugged into a compatible switchgear upon its arrival at that site.

The manufacturer of the K-Don circuit breaker did not, however, select a specific breaker for its ultimate use. According to Kuzmack, original equipment manufacturers, such as Cooper, selected K-Don circuit breakers and other component parts to use in assembling their respective

switchgear, which in his words was "an assembled product."
The ITE K-Don circuit breaker could be used in different
manufacturers' switchgear provided a cradle compatible to
the K-Don breaker had been installed in the switchgear.

Kuzmack also testified that ITE, the manufacturer of
the K-Don circuit breaker, provided an instruction bulletin
that was placed in the carton with each breaker. According
to Frederick C. Teufel, who had also worked for the
manufacturer of the K-Don circuit breakers for many years,
the instruction booklet advised customers to tell ITE if a
circuit breaker was going to be exposed to unusual service
conditions.[6] Based on a shop order, Teufel identified the
circuit breaker involved in the explosion as having been
manufactured by ITE. He further stated that the circuit
breakers listed on the shop order had no special
requirements, thus implying that they were not to be used
in unusual service conditions.

The vaults that housed the switchgear and circuit
breakers under the piers after the renovation were
specially designed because of the unusual service

---

[6] Helmut Gunther Brosz, Melendez's witness who was
qualified at trial as an expert in the field of electrical
engineering and equipment failures, defined the term
"[u]nusual service condition" as "those conditions which
involve any humidity, salt fog, dripping water, unusual
gases, high temperatures . . . ."

conditions in which the switchgear and circuit breakers would be used. According to Smith, the special design of the vaults included walls and a floor that were monolithically cast, completely waterproof, and set in place with cranes. In other words, the vaults were designed to provide an indoor environment. Thus, Smith's design specifications provided for indoor switchgear and circuit breakers for use in the vaults.

According to a Materials List prepared by Cooper, it supplied switchgear and ITE K-Don circuit breakers to the Navy for the renovation project, including the switchgear and circuit breaker at issue in this case. Although the Navy's specifications allowed circuit breakers other than those manufactured by ITE, Cooper utilized the ITE K-Don circuit breaker. As required by the Navy's contract specifications, those circuit breakers were "draw-out" breakers, meaning that they were designed to be "racked" or installed in an energized switchgear.

Cooper's Materials List also contained items such as strip heaters and humidistats, which, according to Melendez's expert witness Helmut Brosz, indicated Cooper's awareness of the unusual service conditions in which the switchgear and circuit breakers would be used by the Navy in the piers. Thus, Brosz opined that Cooper should have

11

advised the manufacturer of the circuit breakers about the unusual service conditions in which the breakers would be used and that Cooper violated industry standards by failing to do so.

In addition to providing information to the circuit breaker manufacturer, Brosz testified that the switchgear assembly manufacturer, in this case Cooper, also should have communicated to the end user, i.e., the Navy and its workers, that because of the unusual service conditions, special tests should be carried out from time to time. However, Brosz stated that Cooper did not provide any instruction manual for the switchgear assembly with regard to the unusual service conditions and the need for special maintenance and testing. Thus, Brosz opined that the switchgear assembly, as sold to the Navy without such a manual, was an unreasonably dangerous product and defective for use in the piers.

In 1993, the Navy commenced a project to overhaul and retrofit the circuit breakers at its naval base in Norfolk, including those in Pier 23. Westinghouse performed the retrofit for the Navy, which included putting a new digital line tripping system on the circuit breakers and then testing the breakers. During the project, the circuit breakers were removed from the switchgear and stored in a

12

building on the naval base where Westinghouse performed the retrofit. While the circuit breakers were being retrofitted, preventive maintenance was performed on the piers, switchgear, and vaults.

Robert Shematek, an employee of Westinghouse during the retrofitting project, testified that Westinghouse conducted some instructional classes "for just about everyone who worked" for the Navy with regard to the new tripping system and maintenance of the circuit breakers. However, the record does not contain evidence that Melendez attended any of those classes. Shematek stated that the instructions given during the classes, as well as those contained in a booklet titled "Westinghouse Digitrip Retrofit System," included a warning not to install the circuit breakers in an energized switchgear. Shematek also stated that he gave a similar oral warning to Melendez's supervisor, Larry Dean Agee. However, Agee denied having received such a warning from either Westinghouse or Shematek. Shematek also testified that he told Agee that Westinghouse would not permit Shematek to go down into the vaults because the conditions in them were unsafe. However, Shematek admitted that Westinghouse had a general policy against his going into confined spaces "with live gear."

13

Agee testified that, on the day of the explosion, the circuit breaker that later exploded was moved from the storage building where Westinghouse had retrofitted and tested it to Pier 23.[7] The preventive maintenance and testing on Vault 21 had previously been completed, and Pier 23 had been energized for more than 24 hours. Part of the maintenance work had been to dry out the vaults and switchgear. Agee admitted that Pier 23 was one of the piers having the greatest problem with water infiltration in the vaults. He specifically remembered seeing condensation and water on the switchgear in Vault 21.

Because the vaults had been subjected to moisture and other adverse conditions for over a year during the retrofit project, Shematek questioned whether they had been properly dried out. Shematek testified that, despite such concerns, Agee stated that he was going to do whatever was necessary to get Pier 23 back in service within two weeks as requested by the Navy. However, Agee disputed making such a statement to Shematek.

Once the circuit breaker arrived at Pier 23, it was lowered into Vault 21 through a manhole, using a rope and winch. Melendez, Agee, and another co-worker were in the

---

[7] According to a test sheet supplied by Westinghouse, the circuit breaker at issue was tested on August 11, 1993.

vault to receive the circuit breaker, take off the rope, and install the breaker in the switchgear.  After the circuit breaker was slid into its cubicle and "racked in," it exploded, sending out a fireball.  Melendez testified that he saw his co-worker with flames all over his body and then realized that he was also on fire.

After the explosion, the Navy hired Brosz, through an engineering firm, to investigate the accident.  Brosz was on the site within two days after the explosion.  When he went down into Vault 21 on Pier 23, Brosz found "an electrical switchgear that was covered in soot, and . . . evidence of electrical arcing at the bottom right-hand circuit breaker . . . ."  He testified that the cause of the explosion was the absorption of moisture by the glass fiber reinforced polyester insulation (GFRP) used in the K-Don circuit breakers.  The moisture caused the insulation to degrade over a period of several years.  The degradation, meaning that the insulation had lost its insulating power, in turn precipitated a short-circuit, arcing, and the explosion.  Brosz could find no other cause for the explosion, and specifically stated that Melendez did not do anything wrong on the day of the accident.  Brosz testified that the circuit breaker was designed to be installed in an energized switchgear and that Melendez had

15

followed the practice used by electricians at the naval base.  However, Brosz acknowledged that, if the switchgear had not been energized when Melendez installed the circuit breaker, the explosion would not have occurred.

Cooper's expert witness, Bledsoe, could not determine the cause of the explosion.  He did agree that the K-Don circuit breaker was designed to be installed in an energized switchgear and that he had done so "[p]lenty of times."

ANALYSIS

### A. <u>Proximate Causation and Misuse</u>

Cooper argues that Melendez failed to prove "that anything Cooper did or failed to do was the proximate cause of his injuries" because Melendez's expert witness, Brosz, admitted that the accident would not have occurred if Melendez had not installed the circuit breaker in an energized switchgear.  Continuing, Cooper points out that Melendez and his co-workers had installed 20 to 30 circuit breakers in switchgears that were not energized without any incident, and that only when he and his supervisor decided to "detour" the rules did the explosion ensue.

Acknowledging that the issues of proximate causation and misuse are related in this case, Cooper also asserts that Melendez's decision to install the breaker in an

16

energized switchgear constituted a misuse of the circuit breaker. Additionally with regard to the issue of misuse, Cooper contends that the switchgear and circuit breakers were intended for indoor use but that the Navy allowed moisture to accumulate in the vaults, thereby subjecting the switchgear and breakers to outdoor conditions. It was this moisture that caused the GFRP insulation to degrade, which in turn precipitated the short-circuit, arcing, and explosion. Thus, Cooper argues that both Melendez and the Navy misused the switchgear and circuit breakers, and that such misuse bars Melendez's breach of warranty claim.

A proximate cause of an event is that "'act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred.'" Sugarland Run Homeowners Ass'n v. Halfmann, 260 Va. 366, 372, ___ S.E.2d ___, ___, (2000) (quoting Beale v. Jones, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970)). Generally, the question of proximate cause is an issue of fact to be resolved by a jury. Jenkins v. Payne, 251 Va. 122, 128, 465 S.E.2d 795, 799 (1996).

As Cooper argues, proximate cause and misuse are related in this case. There cannot be a recovery against a manufacturer in a product liability case for breach of an

implied warranty when there has been an unforeseen misuse of the article.  <u>Featherall v. Firestone Tire & Rubber Co.</u>, 219 Va. 949, 964, 252 S.E.2d 358, 367 (1979); <u>Layne-Atlantic Co. v. Koppers Co.</u>, 214 Va. 467, 473, 201 S.E.2d 609, 614 (1974).

In the present case, the court instructed the jury that Melendez had the burden of proof to establish that, if Cooper breached an implied warranty of merchantability or fitness for a particular purpose, such breach was <u>a</u> proximate cause of the accident.  The court also instructed the jury that Melendez could not recover from Cooper for a breach of warranty if "the product was misused in a way that was not reasonably foreseeable by [Cooper], and . . . that the misuse was <u>the</u> proximate cause of [Melendez's] injuries."  (Emphasis added.)  Because these instructions were not the subject of an assignment of error, they are now the law of this case.[8]  <u>See</u> <u>King v. Sowers</u>, 252 Va. 71, 77, 471  S.E.2d 481, 484 (1996).  Thus, Melendez had to prove only that Cooper's alleged breach of warranty was <u>a</u> proximate cause of the explosion; whereas, Cooper had to prove that any misuse was <u>the</u> proximate cause.

---

[8] We express no opinion regarding whether those instructions are a correct statement of the law in this Commonwealth.

18

As we previously stated, the jury verdict for Melendez resolved all conflicts in the evidence in his favor and entitled him to all just inferences fairly deducible from the evidence. Pugsley, 220 Va. at 901, 263 S.E.2d at 76. Applying these principles, we conclude that the issues of proximate causation and misuse were questions to be decided by the jury and that there is sufficient evidence to support the verdict in favor of Melendez with regard to those issues.

First, Melendez established through Brosz's testimony that the explosion was caused by the degradation of the insulation used in the circuit breaker. The insulation degraded because it absorbed moisture. Cooper selected the K-Don circuit breaker knowing that it would be used by the Navy in unusual service conditions, yet the evidence showed that Cooper did not share its knowledge with the manufacturer of the circuit breaker, nor did it warn the Navy that the insulation in the circuit breakers could degrade if exposed to moisture. Although Cooper argues that the Navy allowed the vaults and switchgear to be exposed to outdoor conditions during the year that the circuit breakers were being retrofitted, Agee testified that Vault 21 had been dried out and tested before it was energized, approximately 24 hours prior to the explosion.

19

Next, no one disputed the fact that the K-Don circuit breaker was known as a "draw-out" breaker, meaning that it was designed to be installed in an energized switchgear. In fact, many of the witnesses had performed such an operation themselves. Thus, installation of the circuit breaker in an energized switchgear was certainly a foreseeable use and not a misuse. Although Cooper argues that Melendez ignored instructions from Westinghouse that the circuit breakers should not be installed in an energized switchgear, and that the explosion would not have occurred if he had followed those instructions after the retrofit project, Brosz testified that Melendez did nothing wrong and followed the installation procedure used at the naval base for many years.

Furthermore, the evidence was in conflict with regard to whether Melendez's supervisor received such instructions from either Westinghouse or Shematek. Based on Shematek's admission that the manual titled "Westinghouse Digitrip Retrofit System" contained instructions regarding how to install the new digital line tripping system that Westinghouse had placed on the circuit breakers and was not an instruction manual for the use of the circuit breakers, the jury could have concluded that the manual did not pertain to the task being performed by Melendez. Shematek

also admitted that he was not aware of any warning in the ITE instruction manual that the breakers should not be installed in an energized switchgear.

Finally, Cooper argues that Agee decided to "detour," i.e., deviate from, one of the procedures in the preventive maintenance checklist by installing the circuit breaker in an energized switchgear. However, Melendez correctly points out that the preventive maintenance checklist did not address the situation that existed on the day of the explosion. During the retrofit of the circuit breakers, a new cable had also been installed on Pier 23. In order to keep that cable dry and prevent it from exploding, Agee decided to energize the cable. Additionally, if the vault had not been energized, then the very equipment designed to keep it dry, such as the heaters and humidifiers, would not have been operating.

Thus, we conclude that the circuit court did not err in refusing to set aside the jury verdict either on the ground that Melendez did not prove that Cooper's breach of warranty was a proximate cause of his injuries or on the ground that the Navy and Melendez misused the circuit breaker. The facts with regard to both of these issues were disputed and thus subject to being resolved by the jury. "The role of a jury is to settle questions of fact."

21

Supinger v. Stakes, 255 Va. 198, 203, 495 S.E.2d 813, 815 (1998). The jury, as reflected by its verdict, resolved those disputed facts in favor of Melendez and, on review, we will not set aside those findings unless they are clearly erroneous or without evidence to support them. See Code § 8.01-680. When a jury's verdict depends on the weight to be given to credible evidence, that verdict cannot be disturbed. Walrod v. Matthews, 210 Va. 382, 392, 171 S.E.2d 180, 187 (1969).

## B. Statute of Repose

The dispositive question with regard to this issue is whether the switchgear and its component parts, including the circuit breakers, are ordinary building materials or "equipment" within the meaning of Code § 8.01-250, a statute of repose.[9] See Hess v. Snyder Hunt Corp., 240 Va. 49, 52, 392 S.E.2d 817, 819 (1990) (referring to Code § 8.01-250 as a statute of repose). That section provides, in pertinent part, that no action shall be brought to recover for bodily injury "arising out of the defective and

---

[9] A statute of repose differs from a statute of limitations in that the time limitation in a statute of repose commences to run from the occurrence of an event unrelated to the accrual of a cause of action. School Bd. of the City of Norfolk v. U.S. Gypsum, 234 Va. 32, 37, 360 S.E.2d 325, 327 (1987). The limitation period in a statute of limitations generally begins to run when the cause of action accrues. Id., 360 S.E.2d at 327-28.

22

unsafe condition of an improvement to real property . . . against any person performing or furnishing the design, planning, surveying, supervision of construction, or construction of such improvement to real property more than five years after the performance of furnishing of such services and construction."  However, the statute further provides that the five-year limitation "shall not apply to the manufacturer or supplier of any equipment or machinery . . . installed in a structure upon real property."

Based upon the legislative history of Code § 8.01-250, this Court, in Cape Henry Towers, Inc. v. National Gypsum Co., 229 Va. 596, 602, 331 S.E.2d 476, 480 (1985), concluded that this section "perpetuate[s] a distinction between . . . those who furnish ordinary building materials, which are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors, and, . . . those who furnish machinery or equipment."  The five-year limitation in Code § 8.01-250 protects the former category but not the latter one.  Id.

We have utilized that distinction on three occasions to determine into which category certain materials or articles fell.  First, in Cape Henry Towers, the materials at issue were exterior panels of a building.  Id. at 598,

23

331 S.E.2d at 478. Holding that the panels were ordinary building materials, this Court pointed out that machinery and equipment, unlike ordinary building materials, "are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties, voidable if the equipment is not installed and used in strict compliance with the manufacturer's instructions." Id. at 602, 331 S.E.2d at 480.

Next, in Grice v. Hungerford Mechanical Corp., 236 Va. 305, 306, 374 S.E.2d 17, 17 (1988), the question was whether an electrical panel box and its component parts were ordinary building materials or equipment. The defendant, who was an electrical subcontractor, had bought the electrical panel box and its several component parts on separate occasions. Id., 374 S.E.2d at 18. The subcontractor then assembled and installed the unit as part of an electrical system in a house pursuant to its contract with the general contractor. Id. Additionally, the quality and quantity of the component parts, as well as the instructions for assembling and installing the electrical panel box as a unit in a building, were provided by an architect or other design professional. Id. at 309, 374 S.E.2d at 19. The manufacturer did not send any such instructions. Id. Thus, this Court concluded that the

24

electrical panel box and its component parts were ordinary building materials within the purview of Code § 8.01-250. Id.

The third case was Luebbers v. Fort Wayne Plastics, Inc., 255 Va. 368, 498 S.E.2d 911 (1998). There, the items at issue were various structural component materials for in-ground swimming pools, such as steel panels, braces, and vinyl liners. Id. at 370, 498 S.E.2d at 911. A distributor purchased these component parts in bulk from the manufacturer and held them for resale to swimming pool contractors as parts of swimming pool kits. Id., 498 S.E.2d at 912. In concluding that the steel panels, braces, and vinyl liners were ordinary building materials rather than equipment within the meaning of Code § 8.01-250, this Court emphasized the following facts: (1) the component parts at issue were interchangeable with other component materials in swimming pool construction; (2) distributors purchased the materials in bulk from the manufacturer; (3) the manufacturer of the materials did not oversee construction of the swimming pools, but merely warranted the steel panels from defects of workmanship and the vinyl liners from defective welding; and (4) although the manufacturer sold specification guides and installation manuals as general guides, the manuals did not address the

25

construction of the specific swimming pool involved in the case. Id. at 372, 498 S.E.2d at 913. We concluded that the swimming pool materials were "fungible components" of the pool, and that they "[i]ndividually . . . served no function other than as generic materials to be included in the larger whole and [were] indistinguishable . . . from the wall panels . . . addressed in Cape Henry Towers." Id.

Relying on these cases, Cooper argues that the switchgear and circuit breakers were generic items that were "incorporated into the construction of the pier" and were "essential to the existence of the piers," similar to the exterior panels in Cape Henry Towers and the electrical panel box in Grice. Continuing, Cooper describes the switchgear and circuit breakers as fungible items because the Navy's specifications authorized the use of several brands of switchgears and circuit breakers in the renovation project, and because the K-Don breakers themselves were interchangeable. Thus, during the retrofit project, the Navy and Westinghouse did not have to designate out of which switchgear cubicle a particular circuit breaker had been removed.

Cooper also points out that the Navy conceived the pier renovation project in the 1970's; the Navy's agent designed the project; the Navy's subcontractor performed

26

the electrical work; and the Navy's officer in charge of construction supervised the project. According to Cooper, it only supplied switchgears without any special warranties and was not present at the piers during the renovation. Finally, Cooper compares the switchgear to the electrical panel box in Grice because it serves the same basic purpose, although a switchgear is admittedly much larger than an electrical panel box used in a residential dwelling.

Well-established principles guide the resolution of this issue. "[A] plea in bar is a defensive pleading that reduces the litigation to a single issue," Kroger Co. v. Appalachian Power Co., 244 Va. 560, 562, 422 S.E.2d 757, 758 (1992), "which, if proven, creates a bar to the plaintiff's right of recovery." Tomlin v. McKenzie, 251 Va. 478, 480, 468 S.E.2d 882, 884 (1996). The party asserting a plea in bar carries the burden of proof. Id. In the present case, the circuit court, over Melendez's objection, heard the evidence regarding the plea in bar and decided the issue rather than submitting it to the jury. "When the trial court hears the evidence ore tenus, its findings are entitled to the weight accorded a jury verdict, and these findings should not be disturbed by an appellate court unless they are plainly wrong or without

27

evidence to support them." <u>Bottoms v. Bottoms</u>, 249 Va. 410, 414, 457 S.E.2d 102, 104-05 (1995).

Using these principles, we are not persuaded by Cooper's arguments because they are premised on a mischaracterization of the switchgear and circuit breakers as "essential to the existence of the piers." The switchgear and circuit breakers were not part of the electrical system of Pier 23; instead, they comprised the electrical system for submarines docked at the pier so that the submarines could receive electrical power from the shore rather than having to operate their engines and generators. The vaults that housed the switchgear and circuit breakers were located underneath the deck of the pier, and the switchgear was actually placed on rails six inches above the floor of the vault.

Unlike the collection of unassembled parts in <u>Grice</u>, the switchgear and circuit breakers were each self-contained and fully assembled by their respective manufacturers. Cooper manufactured the switchgear, and in doing so, specified in its Materials List the use of K-Don circuit breakers. When the circuit breakers left the manufacturer, they had been tested at the factory and needed only to be placed in a switchgear that contained a compatible cradle. ITE supplied an instruction manual with

each circuit breaker, and the Navy required that the switchgear and circuit breaker bear a nameplate containing certain information, including the manufacturer's name. As the circuit court noted, the Navy also required that the equipment "be established standard tested products of the manufacturer, thoroughly coordinated and integrated by the manufacturer."

Contrary to Cooper's arguments, the switchgear and circuit breakers were not fungible or generic materials. While the Navy specifications would have permitted the use of circuit breakers from different manufacturers, once Cooper specified the ITE K-Don breaker, another manufacturer's breaker could not have been used in Cooper's switchgear unless the cradle had also been changed. In the words of Cooper's expert witness, Bledsoe, the cradle and circuit breaker were "mated component[s]" of the switchgear assembly. Bledsoe also admitted that Cooper assembled the switchgear and, in doing so, selected the component parts, including the circuit breakers, though they were shipped in separate containers to the end user. Thus, we conclude that the circuit court did not err in finding that the switchgear and circuit breakers are "equipment" as

29

contemplated by Code § 8.01-250.[10]  Contrary to Cooper's

argument, the court did not base its decision solely on the

size of the switchgear and circuit breaker.

## C. Jury Poll

Because one juror answered "No" in open court during

the poll of the jury, Cooper contends that there was not a

unanimous verdict.  Thus, Cooper argues that the circuit

court should have immediately declared a mistrial rather

then sending the jury back for further deliberations.  In

other words, Cooper asks this Court to create a bright-line

rule that a trial court must declare a mistrial in a civil

case when a juror answers "No" during the court's poll of

the jury.  Such a bright-line rule would, according to

Cooper, preserve the sanctity of the jury room and insure

that jurors are not subjected to "outside influences," as

Cooper suggests happened in this case.  Cooper also

believes that the absence of a rule for civil trials,

---

[10] We are not persuaded by the several cases cited by
Cooper from other jurisdictions because the relevant
statutes at issue in those cases are significantly
different from Code § 8.01-250.  For example, in Hilliard
v. Lummus Co., Inc., 834 F.2d 1352, 1354 (7th Cir. 1987);
Mullis v. Southern Co. Serv., Inc., 296 S.E.2d 579, 583-84
(Ga. 1982); Neofotistos v. Metrick Electric Co., Inc., 577
N.E.2d 511 (Ill. App. Ct. 1991); and Kleist v. Metrick
Electric Co., Inc., 571 N.E.2d 819, 820 (Ill. App. Ct.
1991), the respective courts addressed whether a particular
item was an improvement to real estate, not whether the
item was ordinary building materials or equipment.

similar to Rule 3A:17 applicable to criminal trials,[11] is an authoritative indication that a jury in a civil case should not be allowed to deliberate further when a juror expresses disagreement with the verdict during the polling of the jury.

In discussing this issue, it is important to emphasize that the circuit court did not record and enter judgment upon a verdict that was not unanimous. Instead, the court directed the jury to continue its deliberations when one juror answered that the verdict that had been published in open court was not his verdict. Shortly thereafter, the jury returned with a verdict that was unanimous as reflected by the court's second poll of the jurors. We agree that a verdict cannot be accepted and recorded if it is not unanimous, and that a juror's assent in open court when the verdict is published is controlling. Thus, since the circuit court did not accept a verdict that was not unanimous, the cases cited by Cooper for the proposition that the only verdict that counts is the one published and affirmed in open court are not relevant to the issue in this case. See e.g., Reed v. Kinnik, 132 A.2d 208, 210

---

[11] Rule 3A:17(d) provides that a jury may be directed to retire for further deliberations if, upon the poll, all jurors do not agree.

(Pa. 1957); Sanders v. Charleston Consol. Ry. & Lighting Co., 151 S.E. 438, 447 (S.C. 1930).

Instead, the issue we must address is whether it is within a trial court's exercise of discretion to direct a jury to deliberate further when a juror answers "No" during the poll of the jury or whether the court must always declare a mistrial in that situation.  We conclude that a trial court is empowered, in the exercise of its discretion, either to direct a jury to continue its deliberations or to declare a mistrial.  "There can be no question of the right of a juror, when polled, to dissent from a verdict to which he [or she] has agreed in the jury room, and when this happens, the jury should either be discharged or returned to their room for further deliberation."  Bruce v. Chestnut Farms-Chevy Chase Dairy, 126 F.2d 224, 225 (D.C. Cir. 1942); accord Patterson v. Rossignol, 245 A.2d 852, 855 (Me. 1968); Botta v. Brunner, 126 A.2d 32, 40-41 (N.J. Super. 1956); Norburn v. Mackie, 141 S.E.2d 877, 880 (N.C. 1965); State ex rel. Volkman v. Waltermath, 156 N.W. 946, 946 (Wis. 1916).  We find no reason to create the bright-line rule urged by Cooper, nor are we persuaded that such a rule is warranted merely because we do not have a rule of civil procedure similar to Rule 3A:17.

In the present case, we conclude that the circuit court did not abuse its discretion by returning the jury to its room for further deliberations. Some of the "outside influences" that Cooper asserts were brought to bear upon the jury in this case are Cooper's characterizations of the reactions of Melendez and others in the courtroom when the verdict was announced and one juror then answered "No." However, the circuit court stated that it did not recall all the events as having occurred exactly as described by Cooper's counsel. For instance, counsel for Cooper described the juror who answered "No" as "very emotional and resisting" when he came out of the jury room the second time. In response, the court stated, "I don't know about resisting." Later, when counsel asserted that some of the jurors started yelling when the juror answered "No," the court stated that it remembered tension, but not any yelling by the jurors. In sum, many of Cooper's contentions with regard to these "outside influences" are not supported by the record in this case.

The circuit court was in a better position than this Court to observe the demeanor of the jurors when they returned to the courtroom and during each poll. We believe that a trial court has the same ability and opportunity to observe a juror's demeanor during a poll of the jury as it

33

does during voir dire.  In that latter situation, we have said, "[b]ecause the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand, the trial court's exercise of judicial discretion in deciding challenges for cause will not be disturbed on appeal, unless manifest error appears in the record."  Pope v. Commonwealth, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987).  We conclude that the same standard applies to a poll of the jury and a trial court's decision, based on that poll, either to declare a mistrial or to direct the jury to deliberate further.  In the present case, the circuit court did not abuse its discretion when it directed the jurors to return to the jury room for further deliberations rather than declaring a mistrial.

Cooper also argues that the circuit court's instructions to the jury immediately after the juror answered "No" were coercive and prevented the jurors from freely making their own decision.  However, Cooper did not at that time object to the content of the court's instructions to the jury.  It moved for a mistrial solely on the basis that the verdict was not unanimous, that the court therefore had to declare a mistrial, and that the

jury had been subjected to "outside influences" in the courtroom. Therefore, we will not consider this argument on appeal.[12] Rule 5:25.

## CONCLUSION

We recognize that the explosion in this case occurred 17 years after Cooper supplied the Navy with the switchgear that utilized the K-Don circuit breaker that exploded. That fact alone, however, does not absolve Cooper of its liability for Melendez's injuries. Thus, for the reasons stated with regard to each of Cooper's assignments of error, we will affirm the judgment of the circuit court.

<u>Affirmed</u>.

---

[12] Although we do not consider the merits of this assignment of error, we believe that when a trial court directs a jury to continue its deliberations in a situation like the one presented in this case, the court should instruct the jurors that they should not surrender their individual consciences for the mere purpose of reaching a verdict.