34

## CIRCUIT COURT OF THE CITY OF RICHMOND

Walter Washington

v.

Square D Co. et al.

February 6, 2006

Case No. LS-672-4

BY JUDGE RANDALL G. JOHNSON

This action arises out of a work-place accident. The motion for judgment alleges that, on March 22, 2002, plaintiff and a co-worker, employees of an electrical contractor, were installing an electrical panel in a room at James Center Tower Two, a large office building in Richmond. While doing so, a ground fault occurred involving bus duct, aluminum structures designed to receive electricity from one or more switchboards and distribute it to various switches and panel boxes which in turn distribute it to the many branch circuits and electrical outlets throughout the building. When the ground fault occurred, the switchboard and the "Ground Fault Circuit Interrupter," or circuit breaker, failed to interrupt the supply of electricity to the bus duct, thereby causing arcing, or "jumping," of electricity from one point to another, explosions, and fire, severely injuring plaintiff. Plaintiff filed suit against Square D Company, which manufactured the components of the electrical system involved in the accident, Eck Supply Company and Eck Enterprises, Inc., alleged to have been distributors of those components, Faison & Associates, L.L.C., alleged to have been the premises owner, Trammell Crow Services, Inc., the property manager, and Virginia Electric and Power Company, which supplied electricity to the site. Through dismissals and nonsuits, Eck Supply Company, Eck Enterprises, Inc., Faison & Associates, L.L.C., and Virginia Electric and Power Company are no longer

parties. The action is presently before the court on Square D's plea of the five-year limitation contained in Va. Code § 8.01-250, a statute of repose. "A statute of repose differs from a statute of limitations in that the time limitation in a statute of repose commences to run from the occurrence of an event unrelated to the accrual of a cause of action. . . . The limitation period in a statute of limitations generally begins to run when the cause of action accrues." *Cooper Industries v. Melendez*, 260 Va. 578, n. 9, 537 S.E.2d 580 (2000) (citation omitted). An evidentiary hearing was held on January 19.

The statute of repose provides, in pertinent part, as follows:

> No action to recover . . . for bodily injury . . . arising out of the defective and unsafe condition of an improvement to real property . . . shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction, or construction of such improvement to real property more than five years after the performance or furnishing of such services and construction.
>
> The limitation prescribed in this section shall not apply to the manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property. . . .

Va. Code § 8.01-250.

Under relevant case law, ordinary building materials are not "equipment or machinery or other articles" excluded from the five-year limitation by the second paragraph of the statute. Thus, the question is whether the electrical components manufactured and supplied by Square D are ordinary building materials, in which case the limitation applies, or equipment, in which case the limitation does not apply. Four Virginia Supreme Court cases are particularly relevant.

In *Cape Henry v. National Gypsum*, 229 Va. 596, 331 S.E.2d 476 (1985), suit was filed to recover damages for construction defects in a condominium apartment building, including extensive water leaks through the exterior walls of the building. Construction of the building was completed in 1975. The manufacturer of the exterior wall panels used in the construction and the manufacturer of a chemical coating that was sprayed on the panels were brought into the suit in 1981. The panels had been purchased from an independent building supply company and were fastened to studs and sprayed with the coating on site. The manufacturers argued that the five-year limitation applied. The trial court agreed and dismissed the manufacturers from the suit. In affirming, the Supreme Court discussed the legislative history of the statute

and two federal cases which, as the Court explained, helped shape its understanding of the legislative history. The Court then said:

> We conclude that the General Assembly intended to perpetuate a distinction between, on one hand, those who furnish ordinary building materials, which are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors, and, on the other hand, those who furnish machinery or equipment. Unlike ordinary building materials, machinery and equipment are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties, voidable if the equipment is not installed and used in strict compliance with the manufacturer's instructions. Materialmen in the latter category have means of protecting themselves which are not available to the former. We construe § 8.01-250 to cover the former category and to exclude the latter.

*Cape Henry*, 229 Va. at 598.

Three years later, in *Grice v. Hungerford Mechanical Corp.*, 236 Va. 305, 374 S.E.2d 17 (1988), the Court was confronted with a case involving items similar to those at issue here, an electrical panel box and its component parts. In that case, the plaintiff administrator alleged that her decedents died of smoke inhalation during a fire at their rental home in 1984 caused by the malfunction of the panel box and its components. The panel box and its components were installed in 1979. Suit was filed in 1986. Defendants were the corporation and a subsidiary that had manufactured the panel box, the panel enclosure, the bus bar, the circuit breakers, and the grounding material, and the electrical subcontractor that purchased, assembled, and installed the items as part of the electrical system. By special pleas, the defendants invoked the five-year limitation of § 8.01-250. Again, the trial court sustained the pleas and the Supreme Court affirmed. In doing so, the Supreme Court rejected the plaintiff's argument that the term "equipment" should be given the meaning set out in Va. Code § 36-97(13), pointing out that such definition was limited to Chapter 6 of Title 36 of the Code. Instead, the Court relied on its decision in *Cape Henry* to hold that the panel box and its components were ordinary building materials and were subject to the five-year limitation. Specifically, the Court noted that "[a]ccording to the agreed statement of facts, the quality and quantity of the component parts of an electrical panel box and the instructions for assembling, wiring, grounding, and installing the unit during

construction of a particular building `are determined by the plans and specifications provided by the architect or other design professional' and `[n]o instructions are received from the manufacturer'." 236 Va. at 309.

Next, in *Luebbers v. Fort Wayne Plastics*, 255 Va. 368, 498 S.E.2d 911 (1998), the Court was called upon to decide whether components of a residential swimming pool were ordinary building materials or equipment. In that case, the plaintiff's decedent died in a swimming pool accident in 1995, allegedly from the negligent design, manufacture, and installation of the pool's component parts. The pool was completed in 1986. Among the defendants were the manufacturer of the component parts and the installer of the pool. The manufacturer made steel braces, panels, and vinyl liners and sold them in bulk to a distributor. The installer purchased from the distributor steel braces, panels, and a vinyl liner manufactured by the defendant manufacturer, as well as components made by other manufacturers, and used them in its installation. The trial court sustained those defendants' pleas of the five-year statute. Once again, the Supreme Court affirmed.

As it had in *Grice*, the Supreme Court in *Luebbers* relied on its holding in *Cape Henry* in deciding that the component parts of the swimming pool manufactured by the defendant manufacturer and installed by the defendant installer were ordinary building materials. It noted that the materials were interchangeable in the swimming pool construction industry with component materials made by other manufacturers and were purchased by distributors in bulk to be used in the construction of swimming pools according to the dimensions and shapes desired by particular customers. The Court also noted that the manufacturer exercised no oversight over the construction of the pools and that the manufacturer's specification guides and installation manuals were general guides for the construction of generic swimming pools, not for the construction of a pool with the particular dimensions and shape of the one involved in the decedent's death. The court concluded:

> Here, as in *Cape Henry Towers*, the materials manufactured by Fort Wayne and incorporated into the finished swimming pool by Crystal Pools were clearly fungible components of that pool. Individually, these items served no function other than as generic materials to be included in the larger whole and are indistinguishable, in this context, from the wall panels we addressed in *Cape Henry Towers*. As such, these materials were ordinary building materials and not "equipment" within the meaning of Code § 8.01-250.

*Luebbers*, 255 Va. at 373.

Lastly, in *Cooper Industries v. Melendez, supra*, the court took on another case involving electrical components. In that case, the plaintiff, a co-worker, and their supervisor were installing a circuit breaker in a switchgear, which is a large metal enclosure containing many component parts, underneath a submarine pier at the Norfolk Naval Base in 1994. From the description of switchgears in the opinion, they seem to be equivalent to the switchboards involved in this case. *See* 260 Va. at 578. While doing so, an explosion occurred resulting in the death of the co-worker and injury to the plaintiff and the supervisor. The plaintiff brought suit against the manufacturers of the switchgear, collectively referred to in the opinion as "Cooper." Cooper, noting that the switchgear had been installed seventeen years before plaintiff's injury, filed a plea under 8.01-250. The trial court held that the statute did not apply and denied the plea, and a jury returned a verdict for the plaintiff in the amount of $5,000,000. The Supreme Court affirmed.

In affirming the trial court's decision, the Supreme Court rejected Cooper's argument that "the switchgear and circuit breakers were generic items that were 'incorporated into the construction of the pier' and were 'essential to the existence of the pier,' similar to the exterior panels in *Cape Henry Towers* and the electrical panel box in *Grice*." 260 Va. at 594. To the contrary, the Supreme Court found that the switchgear and circuit breakers were not part of the pier at all. Rather, "they comprised the electrical system for submarines docked at the pier so that the submarines could receive electrical power from the shore rather than having to operate their engines and generators." *Id*. at 595. In fact, Square D cites that language to argue that *Cooper* has no bearing on the case-at-bar because it is uncontroverted in this case that the electrical components at issue *are* part of James Center Tower II. Contrary to Square D's argument, however, the Supreme Court's finding that the switchgear and circuit breakers were not part of the pier was not the only basis for its decision. Findings directly related to the "ordinary building materials" versus "equipment" question were also important.

First, the Court stated that "[un]like the collection of unassembled parts in *Grice*, the switchgear and circuit breakers were each self-contained and fully assembled by their respective manufacturers. Cooper manufactured the switchgear, and in doing so, specified in its Materials List the use of K-Don circuit breakers." 260 Va. at 595. The Court also noted that "[w]hen the circuit breakers left the manufacturer, they had been tested at the factory and needed only to be placed in a switchgear that contained a compatible cradle. ITE, the manufacturer of the K-Don circuit breakers, supplied an instruction manual with each circuit breaker, and the Navy required that the switchgear and

circuit breaker bear a nameplate containing certain information, including the manufacturer's name." The Navy also required that the equipment "be established standard tested products of the manufacturer, thoroughly coordinated and integrated by the manufacturer." *Id.*

Further, the Court noted that "the switchgear and circuit breakers were not fungible or generic materials. While the Navy specifications would have permitted the use of circuit breakers from different manufacturers, once Cooper specified the ITE K Don breaker, another manufacturer's breaker could not have been used in Cooper's switchgear unless the cradle had also been changed. . . . Cooper assembled the switchgear and, in doing so, selected the component parts, including the circuit breakers, though they were shipped in separate containers to the end user." *Id.* The Court concluded that the switchgear and circuit breakers were "equipment" as contemplated by § 8.01-250. *Id.*

With the above cases in mind, the court now turns to the case-at-bar. As a preliminary matter, the court notes that, while there is no indication in *Cape Henry, Grice,* or *Luebbers* that any party objected to the trial court ruling on the subject plea instead of submitting the question to a jury, the Supreme Court mentioned in two separate places in *Cooper* that the manufacturer in that case did make such an objection. The trial court overruled it. Plaintiff in the case-at-bar makes the same objection. Even though the Supreme Court never expressly said in *Cooper* whether the plea should have been decided by the trial court or by a jury, it is obvious from the fact that the Supreme Court affirmed the trial court's ultimate ruling against the manufacturer that the Supreme Court is of the opinion that the question need not be submitted to a jury in every case. It will not be submitted to a jury in this one.

The parties have stipulated that the materials at issue were installed more than five years before suit was filed. The court also finds, based on the evidence presented at the hearing, that there are several similarities between this case and the three cases discussed above that sustained pleas under § 8.01-250. Like *Grice,* the items under consideration are electrical components. In fact, Square D's expert, Gardner Barnstead, testified that the items at issue in this case are for all intents and purposes the same as the items at issue in *Grice,* just on a larger scale. Also, the items manufactured by Square D were installed in James Center Tower II by contractors and subcontractors chosen and employed by the building's owner, not by Square D. The same was true in *Cape Henry, Grice,* and *Luebbers.* There is also no evidence that Square D provided any on-site supervision of the installation of the electrical system, just as there was no on-site supervision of any of the systems involved in those three cases. Moreover, the electrical system at issue

in this case was designed by, and manufactured in conformity with, specifications and drawings supplied or approved by the owners. In that regard, Square D's expert testified that the initial specifications and drawings were prepared by the owner and sent to Square D to be fashioned into a workable system. Actually, Square D's expert testified that no drawings prepared by the owner have ever been found but that, in his experience, a system of the size involved could not have been manufactured without them. Plaintiff presented no evidence that such a system could have been manufactured without drawings from the owner. The court finds that such drawings were prepared by the owner even though none have been found. Square D then prepared detailed drawings of a system and sent them to the owner for approval. Only after they were approved by the owner were the system and its components manufactured by Square D. There is also evidence that the instruction and installation manuals sent to the site with the manufactured components applied to the manufactured components generally, and not to the installation of the components into James Center Tower II specifically.

On the other hand, there are several facts in this case that are vastly different from the facts of *Cape Henry, Grice*, and *Luebbers*, and are more consistent with the facts of *Cooper*. Unlike *Cape Henry, Grice*, and *Luebbers*, in which the subject materials were manufactured in bulk without a specific end user in mind, the components at issue in this case were manufactured specifically for James Center Tower II in accordance with detailed drawings prepared by Square D and approved by the owner for use in James Center Tower II only. They are not "fungible" or "interchangeable" like the swimming pool components in *Luebbers*, or purchased from a distributor like the wall panels in *Cape Henry*. The "quality and quantity of the component parts" of the system were determined by Square D, not by the owner as was the case in *Grice*. Moreover, not only were the instructions for assembling the components not prepared by the owner's architect or other design professional, as was the situation in *Grice*, the units were actually assembled at one or more of Square D's manufacturing plants. They merely had to be connected to each other and to the building on site.

The court also finds that the quality control and testing exhibited by Square D are more consistent with a finding that the five-year limitation does not apply than with a finding that it does. In this regard, Ronnie Rush, a senior staff engineer with Square D, testified that Square D selected the component parts for the bus-ways (Rush Deposition at 13), the switchboards (Rush Deposition at 32), and the ground fault relays (Rush Deposition at 44). The parties stipulated that the court could consider designated portions of Ronnie

Rush's deposition in ruling on Square D's plea. Rush also testified about the extensive tests and inspections performed by Square D before the components left their respective plants. Rush Deposition at 16-17, 32-33, and 45-47. Detailed instruction manuals showing how to properly connect the components were also sent to the site by Square D. As previously noted, the components were already assembled when they arrived at the site. They just needed to be connected.

The court believes that the facts set out in the two previous paragraphs are more in line with *Cooper* than they are with *Cape Henry, Grice,* or *Luebbers.* Just as the switchgears and circuit breakers in *Cooper* "were each self-contained and fully assembled by their respective manufacturers," 260 Va. at 595, the bus-ways, switchboards, and ground fault relays were each self-contained and fully assembled by Square D. Rush Deposition at 12-13, 32, and 44-45. While the manufacturer in *Cooper* merely "specified in its Materials List the use of K-Don circuit breakers," 260 Va. at 595, a fact relied on by the Supreme Court to affirm the overruling of the manufacturer's plea of the statute, Square D actually selected and assembled the ground fault relay, or circuit breaker, that allegedly failed. Rush deposition at 44. In addition, just as the circuit breakers in *Cooper* "had been tested at the factory and needed only to be placed in a switchgear that contained a compatible cradle," 260 Va. at 595, all of the components manufactured by Square D had been tested and inspected at its plants and needed only to be connected and put into place on site. In *Cooper,* "the Navy required that the switchgear and circuit breaker bear a nameplate containing certain information, including the manufacturer's name." *Id.* Here, Square D placed on its components an Underwriters Laboratory listing label and other safety labels, and a label that has a date code "and what looks like a stamped serial number," so that Square D would know the date the product was manufactured and the shift and clock number of the person at the end of the assembly line. Rush Deposition at 17-18.

In addition to the above, there are other similarities between this case and *Cooper.* The court has already discussed the fact that the components manufactured by Square D are not fungible or generic materials. They were manufactured and assembled by Square D specifically for James Center Tower II. This is identical to the finding that the switchgears and circuit breakers in *Cooper* "were not fungible or generic materials. . . . Cooper assembled the switchgear and, in doing so, selected the component parts, including the circuit breakers. . . ." 260 Va. at 595.

In weighing the similarities and differences between the facts of the case-at-bar and the facts of *Cape Henry, Grice, Luebbers*, and *Cooper*, the following language from *Cape Henry*, already set out above, is particularly instructive:

> Unlike ordinary building materials, machinery and equipment are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties, voidable if the equipment is not installed and used in strict compliance with the manufacturer's instructions. Materialmen in the latter category have means of protecting themselves which are not available to the former. We construe § 8.01-250 to cover the former category and to exclude the latter.

*Cape Henry*, 229 Va. at 598.

No evidence was presented in this case about manufacturer's warranties. The evidence that was presented, however, shows that Square D consistently exhibited and maintained the control referred to in *Cape Henry* as being indicative of a manufacturer of equipment rather than a manufacturer of ordinary building materials. Square D prepared the final drawings of the electrical system and components, manufactured the system and components, and assembled the system and components. The only control it did not exercise and maintain was connecting the assembled components to each other and to the building. That was done on site by persons not under Square D's control, just as the components manufactured and assembled by the manufacturer in *Cooper* were placed in their final positions by persons not under the control of that manufacturer. Nevertheless, just as the trial court and the Supreme Court held that the five-year limitation did not apply to the manufacturer in *Cooper*, and because the other facts discussed above are more consistent with the facts of *Cooper* than they are with the facts of *Cape Henry, Grice*, and *Luebbers*, the court holds that the five-year limitation does not apply to Square D in this action. Its plea will be denied.