# CIRCUIT COURT OF PRINCE WILLIAM COUNTY

Royal Indemnity Co.
and American Empire
Surplus Lines
Insurance Co.

v.

SimplexGrinnell, L.P.,
Tyco Fire Product, L.P.,
and Edwin Flores

February 20, 2009

Case No. (Civil) 67519

BY JUDGE ROSSIE D. ALSTON, JR.

This matter came before this court on the Pleas in Bar filed by Defendants SimplexGrinnell, L.P., ("SimplexGrinnell") and Tyco Fire Products, L.P., ("Tyco") respectively. The court heard evidence and oral argument at hearings on December 17, 2008, and February 13, 2009, and took the matter under advisement. After consideration of the record in this matter and review of the applicable case law, the court reaches the following conclusions.

*Introduction*

In this case, the issue is whether the Plaintiffs' tort claims against the Defendants are barred by the statute of repose. For the reasons stated below, the Court sustains the Defendants' respective pleas in bar.

*Background*

First Centrum, L.L.C., and Centrum-Prince William, L.P., were developers who undertook to develop and build the River Run Apartments, an apartment complex in Woodbridge, Virginia. Apartment Contracting Corporation ("ACC") contracted with SimplexGrinnell for the benefit of Centrum-Prince William for the design and installation of a fire sprinkler system for the apartment complex. The parties stipulate that the intent of the contract specifications was for SimplexGrinnell to provide a fire sprinkler system, complete in every aspect, free from all defects in workmanship and materials in accordance with any and all codes in effect.

SimplexGrinnell designed the automatic fire sprinkler system for the River Run Apartments and selected the components for the fire sprinkler system. SimplexGrinnell purchased Tyco F960/Q46 side wall sprinklers for use on the balconies at the River Run Apartments. Tyco assembled, sold, and shipped these sprinkler heads prior to June 16, 1997. The sprinkler heads were neither designed nor manufactured specifically for the River Run Apartments. According to the expert testimony of Mr. Donald Pounder,[1] the F960/Q46 sprinkler head was not designed exclusively for use on exterior balconies and could be used in various locations, from walk-in freezers to interior hallways.

The parties seem to agree that there was no requirement that SimplexGrinnell use F960/Q46 sprinklers in its system; it could have used sprinkler heads designed and manufactured by other manufacturers, provided they were suitable for the proposed system. The F960/Q46 sprinkler heads in and of themselves had no independent function unless connected to a water supply and installed in a fire sprinkler system. Once installed, the sprinkler was part of the building's fire protection system.

All components of the sprinkler head were assembled at the factory and sold as a completely assembled sprinkler head as required by the National Fire Protection Association and Underwriters Laboratories, independent safety certification organizations. These sprinkler heads were sold in bulk to distributors and installers. The sprinkler heads were accompanied with a Technical Data Sheet, specific to that sprinkler, but not specific to any facility or project. This Data Sheet provides general information about the product and installation guidelines. Each F960/Q46 was marked with the Grinnell

---

[1] Mr. Pounder is a part-time consultant with Tyco Fire Products. Until last year, he had been the Vice President of Engineering at Tyco. The parties have stipulated to his expertise, as he has 28 years of experience in the fire protection industry.

Corporation's registered trademark, a "G" inside a triangle, among other markings. As noted below, Tyco is the successor in interest of the Grinnell Corporation.

The F960/Q46 sprinkler head is an automatic dry sprinkler of the frangible bulb type. When the sprinkler is in service, water is prevented from entering the yoke assembly by a plug and an O-ring seal in the inlet of the sprinkler. The glass bulb contains a fluid that expands when exposed to heat. When the rated temperature is reached, the fluid expands sufficiently to shatter the glass bulb, and the bulb seat is released. The compressed spring pulls outward on the yoke, withdrawing the plug and O-ring seal from the inlet, allowing the sprinkler to activate and flow water.

On February 8, 2003, there was a fire on the exterior balcony of Unit 310 at the River Run Apartments. The fire allegedly began when lit smoking materials were discarded in a planter on the wooden balcony. The F960/Q46 sprinkler heads at the River Run Apartments were connected to an alarm system monitored by a central monitoring station. The system was designed such that, when water flows out of the sprinkler head, a signal is sent to the central station monitoring company, which reports to the local fire department. No alarm was sent at the time of the fire on February 3, 2003, because the sprinkler heads installed in Units 310 and 410 did not open to allow the flow of water.

Plaintiffs, Royal Indemnity Company ("Royal") and American Empire Surplus Lines Insurance Company ("American Empire"), were the insurers of First Centrum, L.L.C., and Centrum-Prince William, L.P., at the time of the fire. For the purpose of this litigation, Tyco is the successor in interest to and stands in the shoes of Grinnell Corporation, which designed, assembled, and sold the sprinkler heads in question. Grinnell Corporation sold its products throughout the United States and to foreign countries, and some of these sales were made through distributors.

Royal and American Empire filed a joint motion for judgment on December 29, 2005. The plaintiffs asserted claims for property damage against TFP for negligence in the selection of materials, design, and manufacture of the F960/Q46 sprinkler heads and for failure to warn of known defects in the O-ring sprinkler heads. The plaintiffs also asserted claims for property damage against SimplexGrinnell for negligence in the supply of defective F960/Q46 sprinklers, breach of expressed warranty concerning the performance of the sprinklers, and failure to warn of known defects in the sprinklers. Finally, the plaintiffs asserted claims against SimplexGrinnell for negligent performance of its duties under an inspection agreement.

The action is presently before the court on SimplexGrinnell's and Tyco's respective pleas in bar based on the statute of repose, as stated in Virginia Code § 8.01-250. The defendants argue that the plaintiffs' tort claims are precluded by the five-year limitation contained in this code provision.

*Analysis*

There is no dispute that the instant action was filed more than five years after the installation of the sprinkler heads at the River Run Apartments. Accordingly, the dispositive question with regard to the statute of repose is whether the F960/Q46 sprinkler heads are ordinary building materials or "equipment" within the meaning of Virginia Code § 8.01-250. *See Cooper Indus., Inc. v. Melendez*, 260 Va. 578, 592 (2000) (citing *Hess v. Snyder Hunt Corp.*, 240 Va. 49, 52 (1990)). Section 8.01-250 provides:

> No action to recover for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of such injury, shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction, or construction of such improvement to real property more than five years after the performance or furnishing of such services and construction.
>
> The limitation prescribed in this section shall not apply to the manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property. . . .

The Virginia Supreme Court has concluded that Virginia's statute of repose "perpetuates a distinction between those who furnish ordinary building materials, which are incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors, and . . . those who furnish machinery or equipment." *Cooper Indus.*, 260 Va. at 592-93 (quoting *Cape Henry Towers, Inc. v. National Gypsum Co.*, 229 Va. 596, 602 (1985)). The five year limitation in the statute of repose protects those who furnish ordinary building materials, rather than those who furnish machinery or equipment. *Id.* at 593.

The *Cooper* Court points out: "A statute of repose differs from a statute of limitations in that the time limitation in a statute of repose commences to run from the occurrence of an event unrelated to the accrual

of a cause of action. The limitation period in a statute of limitations generally begins to run when the cause of action accrues." *Cooper Indus.*, 260 Va. at 592, n. 9.

The Virginia Supreme Court has addressed this distinction between ordinary building materials and equipment on a number of occasions. Unfortunately, the Virginia Supreme Court has not considered sprinkler heads specifically. The Virginia case law and the jurisprudence of sister jurisdictions is instructive nonetheless.

In *Cape Henry Towers, Inc. v. National Gypsum Co.*, 229 Va. 596 (1985), the Virginia Supreme Court held that exterior panels that the general contractor purchased from the defendant were ordinary building materials. *Id.* at 603. The general contractor screwed the panels to interior studs and coated the outside of the panel with an oil-based polyester resin manufactured by yet another party, thus forming the exterior skin of a building. *Id.* at 598. In distinguishing between ordinary building materials and machinery and equipment, the Supreme Court further explained the rationale for limiting the statute of repose only to the manufacturers of ordinary building materials:

> Unlike ordinary building materials, machinery and equipment are subject to close quality control at the factory and may be made subject to independent manufacturer's warranties, voidable if the equipment is not installed and used in strict compliance with the manufacturer's instructions. Materialmen in the latter category have means of protecting themselves which are not available to the former. We construe § 8.01-250 to cover the former category and to exclude the latter.

*Id.* at 602. *See also, Washington v. Square D Co.*, 71 Va. Cir. 34, 36 (City of Richmond 2006).

The Virginia Supreme Court next considered whether an electrical panel box and its component parts were ordinary building materials in *Grice v. Hungerford Mechanical Corp.*, 236 Va. 305 (1988). In that case, the Court relied primarily on *Cape Henry* and held that an electrical box and its components were ordinary building materials. *Id.* at 309. In holding that the electrical box was subject to the statute of repose, the Court noted that:

> the quality and quantity of the component parts of an electrical panel box and the instructions for assembling, wiring, grounding, and installing the unit during construction of a particular building "are determined by the plans and

specifications provided by the architect or other design professional" and "[n]o instructions are received from the manufacturer."

*Id.*

Next, in *Luebbers v. Fort Wayne Plastics, Inc.*, 255 Va. 368 (1998), the Virginia Supreme Court affirmed the trial court ruling that the components of a residential swimming pool were ordinary building materials. The defendant manufacturer in that case made steel braces, panels and vinyl liners and sold them in bulk to a distributor. *Id.* at 370. The installer purchased from a distributor these products, along with products made by other companies, and installed them in the plaintiff's pool. *Id.*

In deciding that the pool components were ordinary building materials, the Court noted that the steel panels, braces and vinyl liners were "interchangeable in the swimming pool industry with component materials made by other manufacturers." *Id.* at 373. The Court also noted that the materials were purchased by distributors in bulk and that the manufacturer exercised no oversight over the construction of the swimming pools; however, it did sell specification guides and installation manuals, in addition to generic vinyl pool construction guides. *Id.* The manufacturer also warranted that its products would be free of defect. *Id.* For these reasons, the Court considered the pool materials to be analogous to the wall panels in *Cape Henry* and held that they were subject to the statute of repose. *Id.*

Finally, in *Cooper Industries, Inc. v. Melendez*, the Virginia Supreme Court held that electrical switchgears were not ordinary building materials under the statute of repose and, therefore, the defendants were not protected by the statute of repose. *Id.* at 598. The Court in *Cooper* was persuaded by the fact that the switchgears were not "essential to the existence of the piers" on which they were located. *Id.* at 595. The Court noted: "The switchgear and circuit breakers were not part of the electrical system of Pier 23; instead, they comprised the electrical system for submarines docked at the pier so that submarines could receive electrical power from the shore rather than having to operate their engines and generators." *Id.*

The Court also compared the switchgear to the pool materials at issue in *Grice*. Importantly, the switchgear and circuit breakers were "self-contained and fully assembled by their respective manufacturers." *Id.* The switchgear manufacturer specified that the switchgear must be used with a particular brand of circuit breaker. *Id.* The circuit breakers were tested at their manufacturer's factory and only had to be placed in switchgears with a compatible cradle. *Id.* These facts were instrumental in the Court's decision

that the switchgears and circuit breakers were not fungible or generic materials. No other circuit breaker was compatible with the switchgear, unless a different cradle was installed in the switchgear. *Id.* The manufacturer's expert witness even testified that the switchgear and the circuit breaker were "mated components." *Id.* Thus, the *Cooper* Court found the materials to be "equipment" as contemplated by Virginia Code § 8.01-250. *Id.* at 595-96.

While the Virginia courts have not looked specifically at sprinkler heads, the defendants brought cases interpreting Minnesota's statute of repose to this court's attention. The Minnesota legislature modeled its statute of repose, Minnesota Statute § 541.05, after Virginia's law, and as such, the state "accord[s] weight to [Virginia's] "interpretation of the borrowed provision." *Integrity Floorcovering, Inc. v. Broan-Nutone, L.L.C,* 521 F.3d 914, 918 (8th Cir. 2008); *Red Wing Motel Investors v. Red Wing Fire Dep't,* 552 N.W.2d 295, 297, n. 2 (Minn. App. 1996).

In the 1996 case, *Red Wing Motel Investors v. Red Wing Fire Dep't,* the Minnesota Court of Appeals held that pipes and sprinkler heads installed in a motel were ordinary building materials under the Minnesota statute. 552 N.W.2d at 297-98. The Minnesota Court of Appeals cited *Cape Henry,* finding that the pipes and sprinkler heads were "incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors." *Id.* at 297 (citation omitted).

The Eighth Circuit Court of Appeals relied on *Red Wing* in considering whether a ventilation fan was an ordinary building material or equipment or machinery in *Integrity Floorcovering, Inc. v. Broan-Nutone, L.L.C.* The Eighth Circuit noted that the fan was "clearly not an ordinary building material such as a nail . . . and the fan is subject to close quality control at the factory and may be covered by independent manufacturer's warranties." *Id.* at 919 (internal quotations omitted). The court then pointed out that ventilation fans are commonly incorporated into buildings and their presence is required under Minnesota building codes. *Id.* at 919-20. The court specifically noted that "items integrally incorporated as part of a building structure, such as a fire sprinkler system, are considered "ordinary building materials." *Id.* at 920 (citing *Red Wing,* 552 N.W.2d at 297). The court also found that the fans were "incorporated into construction work outside the control of their manufacturers or suppliers, at the direction of architects, designers, and contractors." *Id.* at 920 (citing *Red Wing,* 552 N.W.2d at 297). The court distinguished "equipment or machinery" from ordinary building materials by noting that they are "typically large scale items, which are not integral to or incorporated into the building, and could

exist separately from the building structure;" however, the court did state that "stand alone capability is only a factor for consideration," rather than the sole determining factor. *Id.* at 920-21.

While the Minnesota cases are persuasive, this Court may make its decision based on the Virginia case law alone. The parties stipulated that the instant suit was filed more than five years after the sprinkler heads were installed, which was no later than June 1997. Based on the stipulated facts and the evidence presented, there are similarities between this case and the cases previously decided by the Virginia Supreme Court.

As the plaintiffs argue and Mr. Pounder testified, the F960/Q46 sprinkler heads are mechanical devices that are shipped from the factory fully assembled with an attached technical data sheet providing instructions for use. In this way, the sprinkler heads are dissimilar to the electrical boxes in *Grice*, where the subcontractor purchased the component parts separately and received no instructions from the manufacturer.

The sprinkler heads are more similar to the swimming pool products in *Luebbers*. The sprinkler heads were purchased in bulk and the Grinnell Corporation exercised no oversight in the installation of the sprinkler heads in the sprinkler system. Like the manufacturer of the swimming pool products, the Grinnell Corporation provided guidance for installation of the sprinkler heads in the form of its Technical Data Sheet.

Finally, the sprinkler heads in the instant case are not analogous to the switchgears in *Cooper*. Unlike the switchgears in *Cooper*, which were found to be equipment, the sprinkler heads are essential to the building. In *Cooper*, the Supreme Court of Virginia noted that the switchgears were separate from the pier's electrical system; rather, they were there for the benefit of the submarines docked at the pier. In the instant case, the sprinkler heads are required by the building code and constitute an improvement on the real property.

The evidence in the instant case also shows that the sprinkler heads were fungible, unlike the switchgears in the *Cooper* case. Mr. Pounder stated and the stipulated facts show that other sprinkler heads could have been inserted into the River Run Apartments sprinkler system. This is unlike the facts in *Cooper*, where only the defendant's switchgear could be used with the circuit breaker installed on the property.

For the foregoing reasons, the Court holds that the F960/Q46 sprinkler heads were ordinary building materials under the statute of repose and thus subject to the statute of repose's five year limitation. As such, the defendants' respective Pleas in Bar are sustained.